**McGILL et al.**

v.

**NEWARK SURGERY CENTER et al.**

Court of Common Pleas of Ohio,
Licking County.

No. 99–CV–02.

Decided April 3, 2001.

22

24

*James M. Roper,* for plaintiffs.

*Theodore M. Munsell,* for Newark Surgery Center, Ambulatory Resource Centres, Inc. and ARC Management Services.

*Christopher Meyer,* for Licking Memorial Hospital.

*Margaret R. Carmany,* for T. Frederick Weigand, Jr., M.D.

*Gregory B. Foliano,* for Seung Hah Park, M.D.

GREGORY L. FROST, Judge.

## I. *Nature of the Proceedings*

This matter came before court on the motion for summary judgment of defendant Licking Memorial Hospital ("LMH"). After consideration of the pleadings, affidavits, appropriate exhibits, and memoranda, this court makes the following entry. In ruling upon the motion, the court is required to construe the

evidence in a manner most favorable to the plaintiffs, interpreting the record of evidence properly before it, and all reasonable inferences arising from such evidence, in favor of the plaintiffs and against defendant LMH, which is the moving party. Set forth below is a recitation of the relevant facts, so construed in plaintiffs' favor:

## II. *Facts*

The facts giving rise to this action involve the relationship between defendant LMH and defendant Newark Surgery Center ("NSC"), and the events that occurred on December 4, 1998. Until June 1998, LMH was the only entity that provided outpatient surgery in Licking County. However, in June 1998, NSC opened as a provider of outpatient surgical services.

Before opening for business, NSC contacted LMH in an effort to obtain a transfer agreement with LMH. NSC sought the agreement with LMH to allow the transfer of patients from NSC to LMH without incident. One reason for seeking the transfer agreement is that LMH and NSC are within one mile of each other. After numerous failed attempts by NSC to meet with LMH's CEO, William J. Andrews, due to cancelled or rescheduled appointments by Andrews, NSC eventually learned that LMH would not consider a transfer agreement with NSC because NSC is LMH's competitor.

At the same time, NSC was also pursuing a transfer agreement with the Ohio State University Hospital in Columbus, Ohio. NSC successfully obtained a transfer agreement with the Ohio State University Hospital. In addition, NSC obtained an agreement with the Central Ohio Regional Red Cross in Columbus for the supply of blood and blood products. According to testimony on behalf of NSC, NSC did not pursue an agreement with LMH for the supply of blood and blood products because, after LMH refused to consider a transfer agreement with NSC, NSC did not believe LMH would consider an agreement for the supply of blood and blood products.

Notwithstanding, LMH maintains a Central Ohio Regional Red Cross blood bank on its premises. LMH is one of forty entities throughout central Ohio to maintain a Red Cross blood bank. The agreement between LMH and the Red Cross permits LMH to house Red Cross blood and blood products, although LMH does not own the blood or blood products. As already noted, while LMH houses a Red Cross blood bank, and NSC has an independent agreement with the Red Cross in Columbus, LMH and NSC had no agreement with each other concerning the supply of blood and blood products.

Against this backdrop, the court now turns to the tragic events of December 4, 1998. On that date, Patricia McGill underwent elective outpatient surgery at the Newark Surgery Center. As part of the surgery, Mrs. McGill was to undergo a

laparoscopic tubal ligation. During this part of the surgery, bleeding was noted by the surgeon, Dr. Maureen Yablonski. The bleeding was detected at approximately 3:08 p.m. Several minutes later, at approximately 3:10 p.m., the anesthesiologist, Dr. Park, ordered four units of O Negative blood.[1]

According to the testimony of Marcie Kincaid, a managing nurse at NSC, she requested a type and cross-match sample to send to the Red Cross in Columbus to obtain the requested blood. However, Kincaid was instructed by the physicians to call LMH and request the blood. Kincaid testified she called the blood bank at LMH at approximately 3:10 p.m. Kincaid spoke with Carol Hill at the LMH blood bank. The testimony indicates that Kincaid relayed to Hill that four units of blood were needed for an emergency at the surgery center. Kincaid testified that she requested four units of packed red blood cells, while the testimony of the physicians is that Kincaid was instructed, and did, request four units of O Negative blood.[2] Hill denied the request for blood, indicating that LMH had no agreement to supply blood to NSC. Hill also told Kincaid to transfer the patient to LMH. Thereafter, Kincaid informed the physicians LMH would not supply the blood.

During this time frame, Kincaid apparently had also contacted the Red Cross in Columbus to inform them that a type and cross-match would be sent, so they could prepare to release four units of O Negative blood. Kincaid testified, however, that she did not order blood at that time from the Red Cross, because she was still waiting for a type and cross-match sample.

Regardless, by approximately 3:25 p.m., Dr. T. Frederick Weigand had arrived to aid in the surgery, and specifically to help control and/or stop the bleeding. Dr. Weigand instructed Kincaid to again call LMH and request four units of O Negative blood. During the second phone call, Kincaid stated that four units of O Negative blood was needed for a life and death emergency. Again, Hill indicated she was unable to provide the blood.

After the second phone call, and at approximately 3:30 p.m., Kincaid spoke again with the Red Cross in Columbus, Ohio, who, according to Kincaid's testimony, had remained on the phone. Kincaid spoke with JoAnn Kosanke and indicated that NSC needed four units of O Negative blood for an emergency situation. Apparently, Kosanke told Kincaid to make the request to LMH

---

1. The times of various events are approximate and/or disputed. For purposes of this opinion only, the facts are construed most favorably to the plaintiffs, as the nonmoving parties, pursuant to Civ.R. 56.

2. O Negative blood is universal, and therefore does not have to be typed and cross-matched with a patient's blood before being transfused. Units of O Negative blood are referred to, at times, as trauma units.

because it was an emergency. Kincaid explained LMH had already denied the request.

Kincaid was then instructed by the physicians to call LMH a third time to request the blood. Thus, at approximately 3:40 p.m., Kincaid again called Carol Hill at the LMH blood bank. During this call, Dr. Weigand of NSC asked to speak with Dr. Hahn, the pathologist at the blood bank at LMH. Dr. Hahn was apparently unaware of the circumstances, and passed the phone back to Hill. Dr. Weigand testified that Hill stated that she had been instructed not to supply any blood or blood products to NSC. Hill also stated that she would lose her job if she provided the requested blood to NSC. Thereafter, Dr. Weigand told Kincaid to speak with Hill. Dr. Weigand testified that his heart sank as he got off the phone because he did not believe LMH would provide the blood.

Immediately thereafter, Hill apparently told Kincaid to obtain approval to release the blood from the Red Cross, which owns the blood at LMH, and LMH would then release the Red Cross blood from the LMH blood bank. According to the testimony of Kincaid, the Red Cross provided authorization to LMH to release blood from the LMH blood bank.

Simultaneously, Kincaid dispatched two persons to LMH to retrieve the four units of O Negative blood. Upon arrival, the couriers were provided with only two units of O Negative blood. The two units arrived back at the surgery center and were transfused into the patient at approximately 4:00 p.m.

Thereafter, at approximately 4:28 p.m., the physicians prepared the patient for transfer to LMH by ambulance. While moving the patient from the surgery table to the gurney, the patient went into cardiac arrest. The patient was treated and stabilized and then placed in the ambulance for transfer. On the way to LMH, the patient again went into cardiac arrest. Despite continuous efforts during the transfer and at LMH, the patient expired, and was pronounced dead at approximately 5:55 p.m. The blood loss caused the patient's cardiac arrest. Testimony has been submitted by plaintiffs indicating that if blood had been provided earlier, and in the amount requested, the patient could have been saved.

Two other disputed facts are relevant for this decision. First, plaintiff Robert M. McGill, spouse of the decedent, submitted an affidavit stating that he was present at LMH when his wife was brought in from the ambulance. McGill stated that he witnessed his wife covered in bloody drapes as she was wheeled into the hospital, with physicians and nurses working to resuscitate her from cardiac arrest. Second, the hospital chart indicates that the decedent was awake and responsive upon arrival at LMH. Noted on the chart next to these entries is the word "error." With regard to these notations, the testimony is consistent and indicates that the decedent was never conscious from the time surgery commenced, up to the point of her expiration.

LMH now seeks summary judgment on all of plaintiffs' claims against LMH. LMH premises its request for summary judgment by initially arguing, because the decedent was not a patient of LMH until 5:00 p.m. on December 4, 1998, LMH owed no legal duty to supply blood to the decedent. In addition, LMH seeks summary judgment on plaintiffs' claims for survivorship, negligent infliction of emotional distress, and punitive damages. In response, plaintiffs contend that summary judgment must be denied because LMH owed a legal duty to provide blood to the decedent, whom LMH knew was in a life-and-death emergency, because LMH maintains a Red Cross community blood bank on its premises. In addition, and/or alternatively, plaintiffs argue that LMH voluntarily assumed a duty when it released two trauma units of blood to NSC. Finally, plaintiffs contend that genuine issues of material fact exist with regard to the remaining claims, and, therefore, assert that summary judgment cannot be granted to LMH.

### III. *Standard of Review*

The standard to be applied when construing a motion for summary judgment is set out in Civ.R. 56(C), which states:

"Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

In applying this standard, a court must construe the evidence most strongly in favor of the nonmoving party, and must not grant judgment unless "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made" (Civ.R.56[C] ).

In addition, the Ohio Supreme Court has stated:

" '[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. * * * [T]he moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial * * *.' " (Emphasis deleted.) *Vahila v. Hall*

(1997), 77 Ohio St.3d 421, 429, 674 N.E.2d 1164, 1171, quoting *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274.

## IV. *Conclusions of Law*

The first issue to be considered, concerning whether LMH owed a legal duty to supply blood to a person outside the hospital facility, is a question of first impression. It is the absence of items, such as legally recognized relationships or contracts, which make this a case of first impression. There was no contract between LMH and NSC. In addition, there was no hospital-patient relationship until 5:00 p.m. on December 4, 1998. Further, this case does not involve the question of whether a hospital is liable for the negligent conduct of a physician, notwithstanding whether that physician was employed by the hospital or was an independent contractor. With the absence of all of these items, one may be quick to determine there is nothing upon which to base a legal duty on behalf of LMH. However, such a decision cannot be made so quickly, and cannot be made without carefully analyzing the precedent in Ohio involving issues which touch upon the question posed today. The question posed cannot be resolved by hypothesizing about items that are absent. Instead, resolution must be rendered by looking to what is, in accordance with Civ.R. 56, before the court. The court must construe the facts before it in conjunction with the law that is available that has bearing upon the issue.

While the case law in Ohio is silent with regard to whether a hospital owes a legal duty to a patient outside the hospital, the case law does address hospital liability for related issues. Counsel for LMH has submitted a myriad of case law in support of its contention that the hospital owed no legal duty to the decedent. Specifically, LMH asserts that in the absence of an agreement between LMH and NSC, no legal duty to a patient of NSC existed on behalf of LMH. In addition, LMH argues that the existence of an emergency and knowledge by LMH of that emergency do not give rise to a legal duty on behalf of LMH. At the heart of these contentions is the assertion by LMH that, in the absence of a hospital-patient relationship, a legal duty simply cannot exist.

As a preliminary issue, this court must consider whether the principles of negligence, as opposed to principles of medical malpractice, govern the discussion in this case. Plaintiffs, through their complaint, allege negligence on behalf of LMH. LMH, however, asserts that this matter is governed by principles of medical malpractice. In *Sturm v. Univ. of Cincinnati Med. Ctr.* (2000), 137 Ohio App.3d 557, 739 N.E.2d 364, the court likewise considered a case involving the standard of care in the medical community concerning blood banks, and the question of whether the law of negligence or the law of medical malpractice applied. The plaintiffs in *Sturm,* like plaintiffs herein, alleged negligence on

behalf of a blood bank that transfused the plaintiff with blood infected with hepatitis C. While the plaintiffs in *Sturm* alleged ordinary negligence, the trial court nevertheless required some evidence from persons with superior knowledge and skill related to blood transfusions by blood banks. On appeal, the plaintiffs in *Sturm* argued that the trial court incorrectly applied the law governing medical malpractice to the plaintiffs' claims for negligence. In rejecting plaintiffs' argument, and affirming the trial court's decision, the court of appeals stated:

"Under the law of negligence, a defendant must conform to the legal standard of reasonable conduct in light of the apparent risk. *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 578, 613 N.E.2d 1014, 1020. When a situation calls for knowledge and skill superior to that of an ordinary person, persons who possess this superior knowledge and skill must use that degree of care and skill that is reasonable in light of their superior learning and experience. *Id.* at 579, 613 N.E.2d at 1020–1021. This standard of conduct is referred to as 'good practice.' *Id.* Physicians are a common example of persons of superior knowledge and skill held to the standard of good practice. Thus, a person of superior knowledge and skill must employ that degree of care and skill that a person of the same learning and experience of ordinary care, skill, and diligence should employ in like circumstances. *Id.* at 580, 613 N.E.2d at 1021–1022. The relevant standard of good practice must be proven through expert testimony. *Id.* at 579, 613 N.E.2d at 1020–1022." *Sturm*, 137 Ohio App.3d at 561–562, 739 N.E.2d at 367.

The court in *Sturm* went on to note that in *Morse v. Riverside Hosp.* (1974), 44 Ohio App.2d 422, 73 O.O.2d 537, 339 N.E.2d 846, negligence by a blood bank was also alleged, but could only be proven through expert testimony.

■ Similar to *Sturm* and the cases cited therein, the present case alleges negligence on behalf of LMH, which houses a Red Cross blood bank. Because the operations and tasks of hospitals and blood banks are not within the purview of common knowledge, plaintiffs' negligence claims against LMH will require expert testimony. With that said, the court now turns to the question of whether LMH owed a legal duty to supply blood to the decedent, who was in a life-and-death emergency of which LMH had express knowledge, but who was outside LMH's facility and not a patient of LMH.

■ Traditionally, liability on behalf of a hospital is premised on one of three theories. First, hospital liability may be premised on the doctrine of *respondeat superior*. "Under the doctrine of *respondeat superior*, a hospital is liable for the negligent acts of its employees." *Cox v. Ohio State Univ. Hosp.* (1996), 117 Ohio App.3d 254, 259, 690 N.E.2d 552, 555, citing *Avellone v. St. John's Hosp.* (1956), 165 Ohio St. 467, 60 O.O. 121, 135 N.E.2d 410, and *Klema v. St. Elizabeth's Hosp.*

*of Youngstown* (1960), 170 Ohio St. 519, 11 O.O.2d 326, 166 N.E.2d 765. While a hospital may be held liable for the negligent acts of its employees, liability based upon the doctrine of *respondeat superior* is not alleged by plaintiffs herein, and, thus, invites no further discussion.

■ Taking one step beyond the doctrine of *respondeat superior*, a hospital may also be held liable for the negligent acts of an independent contractor, as opposed to the acts of its employee, through the doctrine of agency by estoppel. "A hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital if it holds itself out to the public as a provider of medical services and in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the individual practitioner, to provide competent medical care." *Clark v. Southview Hosp. & Family Health Ctr.* (1994), 68 Ohio St.3d 435, 444–445, 628 N.E.2d 46, 53 (overruling paragraph four of the syllabus in *Albain v. Flower Hosp.* [1990], 50 Ohio St.3d 251, 553 N.E.2d 1038). In *Clark*, the Ohio Supreme Court extended hospital liability for acts of independent medical practitioners based on the reasoning that a patient "had a right to assume and expect that the treatment was being rendered through hospital employees and that any negligence associated therewith would render the hospital liable." *Id.* However, like the doctrine of *respondeat superior*, the plaintiffs *sub judice* have not alleged liability on behalf of LMH for acts of independent medical practitioners. Thus, while the reasoning in *Clark* lends guidance for today's decision, the court need not consider the doctrine of agency by estoppel.

Finally, and in addition to the doctrines of *respondeat superior* and agency by estoppel, a hospital may be held independently liable for its negligent conduct. In this case, LMH asserts no independent liability can be found against it because there was no hospital-patient relationship between the decedent and LMH until 5:00 p.m. on December 4, 1998. In support of this assertion, LMH cites, among others, a number of cases from outside Ohio. Specifically, LMH relies on *Campbell v. Hosp. Serv. Dist. No. 1* (La.App.2000), 768 So.2d 803; *Clough v. Lively* (1989), 193 Ga.App. 286, 387 S.E.2d 573; and *Marchetta v. CPC of Louisiana, Inc.* (La.App.2000), 759 So.2d 151.

Both *Campbell* and *Clough* state there can be no independent liability of a hospital absent a hospital-patient relationship. In *Clough*, the decedent was arrested and brought to the defendant-hospital for a blood sample to be drawn to determine whether the decedent had been operating a motor vehicle while under the influence of alcohol or drugs. While at the hospital, the decedent declined any treatment. After leaving, the decedent expired and suit was filed. The court determined that merely drawing blood pursuant to an arresting officer's request does not give rise to a consensual relationship between the patient and the

hospital. In other words, a patient must actively seek services from the hospital to give rise to a hospital-patient relationship. Because the court found no such relationship came into existence, it determined the hospital could not be independently liable.

In *Marchetta*, the court held in the absence of expert testimony establishing the appropriate standard of care in the community, there could be no independent hospital liability. While *Campbell, Clough,* and *Marchetta* speak generally about independent hospital liability and the need for a hospital-patient relationship, those cases are distinguishable because they all start with a person at the hospital. The question of whether a hospital can be liable because it owes a duty to a person outside the hospital is not considered in any of the above cited cases. Moreover, the court is unaware of any case in Ohio that has considered a hospital's independent duty, or liability, to a person outside that hospital. Therefore, this court must begin its analysis with the very basic principles of duty itself.

 Absent a legal duty, there can be no liability for a negligent act. *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 180, 472 N.E.2d 707, 710; *Estates of Morgan v. Fairfield Family Counseling Ctr.* (1997), 77 Ohio St.3d 284, 293, 673 N.E.2d 1311, 1319. "In Ohio, 'the existence of a duty depends upon the foreseeability of the injury. * * * The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act.' " *Morgan, supra,* citing *Menifee,* 15 Ohio St.3d at 77, 15 OBR at 180, 472 N.E.2d at 710. However, the foreseeability of an injury, in and of itself, is not necessarily sufficient to give rise to a duty. *Id.* Finally, the determination of whether a legal duty exists is a matter of law for the court to decide.

 In Ohio, a duty to warn or a duty to protect third parties does exist if a special relationship has been established. In *Morgan,* the Ohio Supreme Court specifically discussed special relationships and the duty to control. Therein, the court held:

"Generally, a defendant has no duty to control the violent conduct of a third person as to prevent that person from causing physical harm to another unless a 'special relation' exists between the defendant and the third person or between the defendant and the other. In order for a special relation to exist between the defendant and the third person, the defendant must have the ability to control the third person's conduct." *Id.,* at paragraph one of the syllabus.

In considering the establishment of a duty based upon a special relation, the court discussed 2 Restatement of the Law 2d on Torts, and began with the premise, "that there is no duty to act affirmatively for another's aid or protection

absent some 'special relation' which justifies the imposition of a duty." *Morgan,* 77 Ohio St.3d at 293, 673 N.E.2d at 1319, citing 2 Restatement of the Law 2d, Torts (1965) 116–130, Sections 314–319; *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92, 529 N.E.2d 449, 455; *Hill v. Sonitrol of Southwestern Ohio, Inc.* (1988), 36 Ohio St.3d 36, 39, 521 N.E.2d 780, 783; and *Gelbman v. Second Natl. Bank of Warren* (1984), 9 Ohio St.3d 77, 79, 9 OBR 280, 282, 458 N.E.2d 1262, 1263. By recognizing a special relation existed between the defendant-psychotherapist and the third person-outpatient, the court in *Morgan* resolved the very narrow issue of " 'whether a psychiatrist's duty to protect a person from the violent propensities of the psychiatrist's patient extends to the outpatient setting.' " (Citation omitted.) *Morgan,* 77 Ohio St.3d at 292, 673 N.E.2d at 1318. In addition, though, the court also recognized that a special relation may exist between the defendant and a person who is not the outpatient. In reaching these conclusions, the court not only discussed foreseeability and the existence of a special relation, but also discussed public policy and the broader concepts of duty.

Similarly, in *Clark v. Southview Hosp. & Family Health Ctr.,* 68 Ohio St.3d 435, 628 N.E.2d 46, the Ohio Supreme Court discussed the evolving and contemporary role of hospitals in today's society. In considering the role of hospitals in light of public policy, the court stated:

"As an industry, hospitals spend enormous amounts of money advertising in an effort to compete with each other for the health care dollar, thereby inducing the public to rely on them in their time of medical need. The public, in looking to the hospital to provide such care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein. Indeed, often the very nature of a medical emergency precludes choice. Public policy dictates that the public has every right to assume and expect that the hospital is the medical provider it purports to be." *Id.,* 68 Ohio St.3d at 444, 628 N.E.2d at 53.

The above public policy concerns have direct bearing upon the issue of whether a legal duty exists. Indeed, in *Morgan,* the court likewise stated:

"[D]uty is not an immutable concept, nor is it grounded in natural law. As Prosser & Keeton explains, '[t]he statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. * * * "[D]uty" is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.' Prosser & Keeton on Torts, *supra,* at 357–358, Section 53. Thus, ' "duty" is only a word with which

we state our conclusion, and no more.' *Id.* at 281, Section 43." *Id.,* 77 Ohio St.3d at 297–298, 673 N.E.2d at 1322.

When considering the issue in this case, it is incumbent to bear in mind the underlying principles of duty, and carefully weigh those principles along with the pertinent public policy interests.

Turning then to the case at bar, and in consideration of all of the above, this court will first determine whether LMH as a hospital with a Red Cross community blood bank on its premises owes a legal duty to provide blood from that blood bank to a person outside the hospital, who is not a patient of the hospital but who is in a life-and-death emergency of which the hospital has knowledge. The court will then separately determine whether LMH acted as a volunteer when it released Red Cross blood from its premises to NSC, and if so, whether there is any genuine issue of material fact concerning whether LMH breached the duty of ordinary due care. Next, the court will determine whether the contract between LMH and the Red Cross gives rise to a duty to aid persons in life-and-death situations by providing blood and blood products to those persons in the community, even if those persons are not patients of the hospital or within the hospital facility. Finally, the court will discuss the remaining claims for which LMH seeks summary judgment. Those claims include survivorship, negligent infliction of emotional distress, loss of consortium, and punitive damages.

 As previously noted, in Ohio there is no recognized legal duty on behalf of a hospital acting as a community blood bank to aid a person in a life-and-death emergency outside the hospital's facility. The lack of a recognized legal duty in this context, however, arises, in part, because there has been no other case in Ohio (or outside of Ohio of which this court is aware) involving the same or similar facts. The present case is unique because the question of whether a legal duty exists does not involve the question of whether the hospital owed that duty on behalf of its physicians, regardless of whether those physicians were employees or independent contractors. Further, this case does not involve a duty to warn or to control the violent conduct of another to protect a third person based upon a special relation—although it bears consideration whether a special relation nevertheless exists because the physicians at NSC are staff physicians at LMH. The issue is further muddied by the role of LMH as a community blood bank, which begs the question of what legal duty is owed by a community blood bank to persons in the community. Moreover, this question must be asked in the context of this case, which involved a life-and-death emergency of which the hospital had express knowledge.

In considering this issue, the court is mindful of the strictures established by the caselaw in Ohio. However, in considering the precise issue presented by the facts of this case, the court finds that no case in Ohio is directly dispositive of the issue concerning the legal duty of a hospital acting as a community blood bank to provide blood to a person outside its facility in a life-and-death emergency. Nevertheless, this court must rely on the authority in Ohio to guide today's decision. Specifically, this court is mindful of the language provided by the Ohio Supreme Court in *Estates of Morgan*, and *Clark v. Southview Hosp.* The very essence of today's decision must resolve the question, "'whether the plaintiff's interests are entitled to legal protection against the defendant's conduct.'" *Morgan*, 77 Ohio St.3d at 298, 673 N.E.2d at 1322," quoting Prosser & Keeton on Torts (1984) 356, 357, Section 53. In determining whether the plaintiffs' interests are entitled to legal protection, the court must also ask what does the community, the public, expect from a hospital that houses a regional community blood bank. In this regard, and as already noted, the Ohio Supreme Court in *Clark*, stated:

"The public, in looking to the hospital to provide such care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein. Indeed, often the very nature of a medical emergency precludes choice. Public policy dictates that the public has every right to assume and expect that the hospital is the medical provider it purports to be." *Clark*, 68 Ohio St.3d at 444, 628 N.E.2d at 53.

The above statement is just as true today as when it was rendered by our Supreme Court.

This court finds that not only does the public have every right to assume and expect that a hospital is the medical provider it purports to be, but the public likewise has every right to assume and expect that a community blood bank is the supplier of blood it purports to be, particularly in a life-or-death situation. Unquestionably, the purpose of a community blood bank is to supply blood. It is against common logic and sense to think that a hospital housing a community blood bank would (a) refuse to supply blood in a life-and-death emergency and (b) have no duty to provide such blood simply because the person in medical need is outside the hospital door. Simply because the situation has not occurred before does not mean a duty does not or should not exist.

In this case, there are competing entities for the provision of outpatient surgical procedures. Also present is the existence of a regional blood bank housed at LMH. The surgeons in this case, while not performing the relevant surgery at LMH, were all physicians with staff privileges at LMH. The surgery in this case presented a life-and-death emergency, which required the transfusion

of blood. LMH knew the situation was one of life and death. The blood was requested three times, and refused at least twice. Eventually, two units, as opposed to the four units requested, was provided.[3] Finally, there is testimony that the patient would not have expired if the blood had been provided sooner, and had been provided in the amount requested. The reasons for not immediately providing the blood include (1) there was no agreement between LMH and NSC for the provision of blood, (2) NSC was viewed as a competitor, and (3) an employee of LMH was told she would lose her job if she provided blood to NSC. Given these facts and the expectation held by the community that a blood bank exists to supply blood to those in need, the court finds that not only was the injury in this case foreseeable, but it was sadly avoidable. The foreseeable risk of the resulting substantial harm, when weighed with the public policy concerns, gives rise to a duty on behalf of LMH, acting as a community blood bank, to provide blood to persons in the community in need, even if those persons are not patients of the hospital and are outside the hospital facility. Accordingly, this court holds that LMH, acting as a community regional blood bank for the Red Cross, owes a legal duty to provide blood to a person outside the hospital facility when the hospital knows that person is in a life-and-death situation. Given this legal duty, and when construing the facts most favorably to the plaintiffs, this court finds a number of genuine issues of material fact exist with regard to whether LMH breached its duty to the decedent.

Moreover, and notwithstanding the above, the court separately finds that LMH assumed a duty to the decedent when LMH decided to provide blood to NSC. In addition to the existence of a legal duty based upon a special relation and/or public policy considerations, a legal duty likewise arises when a person volunteers to help another. A person who voluntarily assumes a duty to help another, which is relied upon by that person, must perform that duty with ordinary due care. *Briere v. Lathrop Co.* (1970), 22 Ohio St.2d 166, 172, 51 O.O.2d 232, 235, 258 N.E.2d 597, 602; *Johnson v. BP Exploration & Oil, Inc.* (1996), 115 Ohio App.3d 266, 269–270, 685 N.E.2d 275, 277. As an alternative argument in this case, plaintiffs assert that when LMH made the decision to release blood to NSC, it owed a duty to use ordinary care, meaning, LMH had a duty to provide four units of blood, as opposed to the two units that were actually provided. According to plaintiffs, because LMH provided only two units of blood, when four had been requested, there is at least a genuine issue of material fact concerning whether LMH breached the duty of ordinary care that arose at the time LMH made the decision to release blood.

---

3. LMH disputes that four units were requested. However, the court must construe this disputed fact in favor of the plaintiffs as the nonmoving parties. Accordingly, the court will assume for today's decision that four units of O Negative blood was requested by NSC.

LMH refutes plaintiffs' argument. In support, LMH relies on *Power v. Boles* (1996), 110 Ohio App.3d 29, 673 N.E.2d 617. In *Power*, the appellate court affirmed the trial court's grant of summary judgment on behalf of the city of Columbus, determining that the city owed no legal duty to the decedent in that case. When considering the issue of duty, the court considered, 110 Ohio App.3d at 34, 673 N.E.2d at 620, Section 323 of the Restatement of the Law 2d Torts (1965) 135, which states:

"Negligent Performance of Undertaking to Render Services

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:

"(a) his failure to exercise such care increases the risk of such harm, or

"(b) the harm is suffered because of the other's reliance upon the undertaking."

The appellate court in *Power*, *supra*, recognized that the above section has been cited with approval by the Ohio Supreme Court, but not formally adopted. Because the court found there was no evidence indicating any actions by the other employees at the scene of the accident increased the risk of harm to the decedent, the court found the above section did not give rise to a legal duty on behalf of the city.

Following this argument, LMH asserts it did nothing to increase the harm to decedent. Therefore, LMH asserts that even if a legal duty did arise when LMH made the decision to supply blood to NSC, LMH could not have breached that duty because the provision of blood, even if only two units, did nothing to increase the risk of harm to the decedent. LMH's argument addresses only half of the issue. While it may be that the provision of two trauma units did not increase the risk of harm to the decedent, unequivocally, the decedent relied upon LMH's decision to release blood and suffered harm because only two units were released and transfused.

Accordingly, this court additionally holds that LMH did act as a volunteer when it decided to provide blood housed at its facility to NSC. As such, this court finds that LMH owed a duty to use ordinary due care in providing that blood. While LMH argues that only two units of blood were requested by NSC, this court must assume that four units were requested because the court is required to construe the facts most favorably to the nonmoving party. In so doing, this court finds genuine issues of material fact exist with regard to whether LMH breached its duty of ordinary due care by only providing two units of blood when four had been requested.

██ Next, plaintiffs argue that the contract between LMH and the Red Cross gives rise to a duty on behalf of LMH to provide blood to patients outside its facility, but within the community. In support of this argument, plaintiffs rely on the following language from the contract between the Red Cross and LMH:

"Upon request by the COR Blood Center, the Facility agrees to release any blood that is not on cross-match. The COR agrees to replace such blood to the Facility as soon as possible, with due consideration to urgency of the releasing Facility's needs. *Except in a life and death situation, the Facility agrees not to transfer any blood outside of the COR participating system or out of the control of the participating facility,* including but not limited to home transfusion services, without express approval of the COR Blood Center." (Emphasis added.)

According to plaintiffs, by implication, the language, "[e]xcept in a life and death situation, the Facility agrees not to transfer any blood outside of the COR participating system," means LMH agrees to provide blood, whether inside or outside of the COR participating system, in a life-and-death situation. Plaintiffs assert that this clause gives rise to a legal, contractual duty on behalf of LMH to respond to life-and-death situations that require the supply of Red Cross blood. In addition, because the language of the contract states that Red Cross retains all ownership interest in the blood products, LMH had no proprietary basis to deny NSC's request for blood on December 4, 1998.

Conversely, LMH argues that the contract between LMH and the Red Cross can not give rise to a duty on behalf of LMH for the benefit of a person who is not a party to the contract. LMH argues that the contract between it and the Red Cross is purely for the establishment of a community blood bank on LMH premises, and for the supply of blood and blood products to LMH from the Red Cross. According to LMH, the contract places no affirmative duty upon LMH to persons who may need such blood or blood products, including the decedent.

While the language of the contract does not expressly state it is intended to benefit third persons, the language does imply LMH is to use, through transfusion, the blood upon a particular need or request. Specifically, the contract states, "All blood units supplied by the COR remain under the ownership * * * of the COR until actually transfused." The contract goes on to include the previously quoted provision regarding life-and-death situations. Because this language speaks in terms of transfusions, and the limitations upon a facility's ability to transfuse, the contract anticipates that the facility (LMH) is to use and provide the Red Cross blood to others. Further, the contract makes no distinction between who may be eligible to receive blood or blood products from that regional blood bank. Because the contract draws no distinction, it must be presumed that the blood and blood products are to be made available to any

person who needs those products in the community, even if that person is outside the hospital facility. Accordingly, because the contract anticipates the use of blood and blood products by LMH, LMH had a duty to provide blood and blood services to a person in need, regardless of whether that person was an admitted patient at LMH. Indeed, nothing in the contract or elsewhere limits LMH's use of the blood to LMH's in-house patients. Given the specific language in the contract that implicates that LMH is to use the Red Cross blood and blood products, this court finds LMH had a duty to use these products on behalf of persons in need in the community. While the court finds a duty arises on behalf of LMH based upon LMH's agreement with the Red Cross, the question of whether LMH breached that duty, and thereby was negligent in failing to aid the decedent, is a question of fact for the jury.

Finally, the court looks to the remaining claims for which LMH asserts that summary judgment must be granted. The first such claim is plaintiffs' survivorship claims. In order to succeed on a survivorship claim, a plaintiff must demonstrate that the decedent suffered conscious pain and suffering. *Laverick v. Children's Hosp. Med. Ctr. of Akron, Inc.* (1988), 43 Ohio App.3d 201, 202, 540 N.E.2d 305, 308; *Harris v. Mt. Sinai Med. Ctr.* (May 28, 1998), Cuyahoga App. No. 72668, unreported, 1998 WL 274507, at * 5. Thus, a "decedent may not recover for pain and suffering when it is shown that the decedent was rendered unconscious at the instant of the injury and died of such injuries without ever having regained consciousness." *Laverick,* 43 Ohio App.3d at 202, 540 N.E.2d at 308.

In this case, the testimony indicates that the decedent did not regain consciousness from the time she sustained the injury to the time she expired. However, a medical record from LMH shows boxes checked by "awake" and "responsive," in relation to the patient's state of consciousness upon arrival at the hospital. The word "error" is also written next to those boxes on the chart. Testimony has been presented indicating those boxes were checked prior to the decedent's arrival at the hospital. Additional testimony further indicated that the anesthetic used during the surgery was turned off and on intermittently once the decedent began to bleed. Because the record includes the chart, which indicates that the decedent was "awake" and "responsive," and because there is testimony that the anesthetic was turned off and on once the bleeding began, the court cannot grant summary judgment to LMH on the survivorship claims. The court, however, also recognizes that the deposition testimony refutes a conclusion that the decedent ever regained consciousness between the time of the injury and her death. Nevertheless, there is evidence to the contrary in the record. Accordingly, LMH is denied summary judgment on plaintiffs' survivorship claims.

LMH must also be denied summary judgment on plaintiffs' claim for negligent infliction of emotional distress. In Ohio, a plaintiff can recover for negligent infliction of emotional distress only if the plaintiff witnessed or experienced a dangerous accident, such that the plaintiff appreciated, and/or was subject to, actual physical peril. *Heiner v. Moretuzzo* (1995), 73 Ohio St.3d 80, 652 N.E.2d 664. It is not necessary for the plaintiff to have sustained a resulting physical injury from the accident or situation. *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, paragraph two of the syllabus. The Supreme Court in *Paugh* additionally held:

"3. Where a bystander to an accident states a cause of action for negligent infliction of serious emotional distress, the emotional injuries sustained must be found to be both serious and reasonably foreseeable, in order to allow a recovery.

"* * *

"3b. The factors to be considered in order to determine whether a negligently inflicted emotional injury was reasonably foreseeable include: (1) whether the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away; (2) whether the shock resulted from a direct emotional impact upon the plaintiff from sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) whether the plaintiff and victim (if any) were closely related as contrasted with an absence of any relationship or the presence of only a distant relationship." *Id.*, at paragraphs 3 and 3b. of the syllabus.

In his affidavit, plaintiff Robert M. McGill states that he was at the hospital (LMH) when his wife arrived by ambulance. Plaintiff additionally stated that he witnessed his wife being brought into the emergency room, covered in blood while the physicians and nurses were trying to save her life. Notwithstanding, LMH contends that because Robert McGill was not present in the operating room at the time the decedent was initially injured, plaintiff's claim cannot succeed.

Construing the facts most favorably to plaintiffs, this court finds that plaintiffs have sufficiently pleaded a cause of action for negligent infliction of emotional distress. Specifically, the court finds that plaintiff Robert McGill, as the decedent's spouse, was within sufficient proximity to his wife, who was covered in blood and under cardiac arrest as she was brought into the emergency room where plaintiff was standing, while a team of doctors and nurses were working to save his wife's life, such that plaintiff could perceive the actual physical peril being suffered by his wife. Also, even though plaintiff viewed his wife after the initial injury had occurred, the injury had not ceased or subsided. Indeed, plaintiff may have viewed his wife at the most critical stage of the events leading up to her death. Because the injury was continuous, and the gravity of his wife's condition so apparent, this court finds that plaintiff could sufficiently ascertain

the physical peril of the situation. Accordingly, LMH's motion for summary judgment on plaintiffs' claim for negligent infliction of emotional distress must be denied.

Likewise, LMH must be denied summary judgment on plaintiffs' claims for loss of consortium. LMH argues that, because loss of consortium is derivative, and because plaintiffs cannot demonstrate a legally cognizable tort against LMH, the loss of consortium claims must fail. Given this court's discussion of duty, above, the court disagrees. Therefore, summary judgment must be denied LMH with regard to plaintiffs' loss of consortium claims.

■■■■■ Finally, LMH is not entitled to summary judgment on plaintiffs' claims for punitive damages. Preliminarily, all parties agree that as a matter of law there can be no punitive damages for a wrongful death cause of action. See R.C. 2125.02. However, punitive damages may be awarded for negligent infliction of emotional distress and/or survivorship. To recover punitive damages, a plaintiff must demonstrate actual malice. *Cabe v. Lunich* (1994), 70 Ohio St.3d 598, 640 N.E.2d 159, paragraph one of the syllabus; see, also, *Shumaker v. Holstein* (Oct. 30, 2000), Stark App. No. 1999CV00020, unreported, 2000 WL 1634177, at * 2. Actual malice can be demonstrated by evidence showing a "state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or * * * a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Citation omitted.) *Cabe, supra,* at paragraph one of the syllabus. In this case, the following conduct on behalf of LMH, if believed, could be construed as demonstrating actual malice: (1) the repeated refusal to supply the requested blood despite having knowledge that the blood was needed for a life-and-death emergency, (2) the denials were due to a decision by LMH not to aid NSC because it was a competitor of LMH, and (3) the denials were made because a hospital employee was told she would lose her job if she supplied blood to NSC. These facts, if believed, demonstrate a conscious disregard for the safety of another who suffered the ultimate harm. The court finds that summary judgment on behalf of defendant LMH with regard to plaintiffs' claims for punitive damages must be denied.

## V. *Conclusion*

The motion for summary judgment by defendant LMH must be, and hereby is, denied its entirety.

*Motion denied.*