******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

AGNES SQUEO, FIDUCIARY (ESTATE OF
STEPHEN J. SQUEO), ET AL. *v.*
THE NORWALK HOSPITAL
ASSOCIATION ET AL.
(SC 19283)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Vertefeuille, Js.

*Argued May 21, 2014—officially released April 28, 2015*

*Brenden P. Leydon*, for the appellants (plaintiffs).

*Michael R. McPherson*, with whom, on the brief, were *Joyce A. Lagnese* and *Jonathan A. Kocienda*, for the appellees (defendants).

*Cynthia C. Bott* and *Karen K. Clark* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Jennifer L. Cox* and *Jennifer A. Osowiecki* filed a brief for the Connecticut Hospital Association as amicus curiae.

*Opinion*

PALMER, J. In *Clohessy* v. *Bachelor*, 237 Conn. 31, 46, 56, 675 A.2d 852 (1996), this court first recognized that, under certain limited circumstances, a bystander to an accident may bring a claim for negligent infliction of emotional distress against the person whose negligence caused that accident, separate and apart from any claims that the primary victim of the accident might have. The present appeal requires us to resolve two issues that *Clohessy* left open: (1) whether, and under what circumstances, a bystander emotional distress claim may be brought in connection with an injury arising from alleged medical malpractice; and (2) what degree of emotional distress a bystander must suffer before he or she may assert a bystander claim for emotional distress. With regard to the first issue, we conclude that a bystander to medical malpractice may bring a claim for the resulting emotional distress only when the injuries result from gross negligence such that it would be readily apparent to a lay observer. This additional element reflects our determination that bystander claims should be available in the medical malpractice context only under extremely limited circumstances. With regard to the second issue, we conclude that a bystander must suffer injuries that are severe and debilitating, such that they warrant a psychiatric diagnosis[1] or otherwise substantially impair the bystander's ability to cope with life's daily routines and demands.

In the present case, the plaintiffs, Agnes Squeo, fiduciary of the estate of Stephen J. Squeo (Stephen), and Joseph Squeo, brought this action, alleging that the defendants, The Norwalk Hospital Association and Deborah M. Shahid, an advanced practice registered nurse, negligently discharged Stephen, the plaintiffs' suicidal son, at approximately 10:30 a.m. on August 15, 2007, after conducting an emergency psychiatric examination at Norwalk Hospital (hospital). The plaintiffs further claimed that they suffered severe emotional distress when, approximately thirty-five minutes after his discharge, they discovered that Stephen had hung himself from a tree in their front yard.[2] The defendants filed a motion for summary judgment as to the plaintiffs' bystander emotional distress claim, contending that such a claim may not be brought in the medical malpractice context and, in the alternative, that there was no genuine issue of material fact as to whether the plaintiffs had suffered severe and debilitating emotional distress. The trial court, *Hon. Kevin Tierney*, judge trial referee,[3] agreed with the latter contention and granted the defendants' motion for summary judgment with respect to the bystander claim. Because we agree that there was no genuine issue of material fact as to whether the plaintiffs suffered *severe and debilitating* emotional distress as a result of the defendants' alleged negligence, we uphold the trial court's decision to grant

the defendants' motion for summary judgment as to the plaintiffs' bystander emotional distress claim.

The record reveals the following relevant facts and procedural history. The plaintiffs brought this action, alleging one count of professional negligence[4] and one count of bystander emotional distress.[5] The trial court summarized the allegations in the operative complaint as follows: "On the evening of August 14, 2007, Agnes Squeo [called] the Norwalk Police Department because her son, [Stephen], was depressed and expressed a desire to harm himself with an electrical cord. Later that evening, [Stephen] was detained by the police and admitted to the hospital for an emergency psychiatric examination. During his stay at the hospital, [Stephen] was evaluated by Shahid. The following morning, Shahid left a telephone message for the plaintiffs indicating that [Stephen] would soon be released from the hospital because he was no longer a danger to himself or others. [Stephen] was allowed to leave the hospital soon after Shahid left the . . . message for the plaintiffs. After walking home alone, [Stephen] obtained [an electrical] cord and immediately [hanged] himself from a tree in the [plaintiffs'] front yard. Soon thereafter, Joseph Squeo saw [Stephen] hanging from [the] tree, and the plaintiffs ran to assist [Stephen]. In an attempt to revive him, the plaintiffs cut the [electrical cord] . . . and administered [cardiopulmonary resuscitation]. Despite the plaintiffs' best efforts, [Stephen] had already suffered [a] substantial brain injur[y], and he ultimately died after being taken off life support on August 23, 2007."

The defendants initially moved to strike the second count of the plaintiffs' complaint, contending that Connecticut law does not recognize a cause of action for bystander emotional distress in a medical malpractice case. The court, *Hon. Edward R. Karazin*, judge trial referee, denied the motion. Recognizing a split of authority in the Superior Court, Judge Karazin concluded that, under certain circumstances, a bystander claim may be brought in the context of a medical malpractice action.[6]

The defendants subsequently filed a motion for summary judgment, in which they (1) renewed their argument that claims of bystander emotional distress cannot be brought in the medical malpractice context, and (2) also contended that there was no genuine issue of material fact as to whether the plaintiffs' emotional distress was severe and debilitating. In support of their motion, the defendants submitted excerpts from the plaintiffs' deposition transcripts and interrogatory responses, in which the plaintiffs admitted that they had required neither medication nor prolonged mental health care as a result of witnessing Stephen's hanging, and also that they had remained steadily employed following the incident. The plaintiffs did not submit affida-

vits or any other documentary evidence in support of their opposition to the defendants' motion for summary judgment.

The trial court granted the defendants' motion for summary judgment with respect to the second count of the complaint, finding that the plaintiffs "failed to demonstrate that there is a material issue of fact [as to whether] the injuries and damages [they] suffered . . . were severe and debilitating." The plaintiffs appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. On appeal, the plaintiffs contend that (1) Connecticut does recognize a cause of action for bystander emotional distress arising out of medical malpractice, and (2) the trial court incorrectly determined that there was no genuine issue of material fact as to the emotional distress that they suffered as a result of witnessing the incident that ultimately led to Stephen's death. Additional facts will be set forth as necessary.

Before we analyze the plaintiffs' claims, we briefly review the development and recognition of bystander emotional distress as a distinct cause of action in the United States and Connecticut. Bystander emotional distress is a derivative claim, pursuant to which a bystander who witnesses another person (the primary victim) suffer injury or death as a result of the negligence of a third party seeks to recover from that third party for the emotional distress that the bystander suffers as a result. Courts historically have been reluctant to recognize this cause of action. Beyond the concerns that once counseled against affording a remedy for any purely emotional injury—the potential for trivial, frivolous or fraudulent claims, and the difficulties involved in tracing the etiology of psychological harms—recognition of bystander emotional distress has been hindered by concerns unique to the bystander context. Specifically, there have been fears that, if anyone who witnesses a serious accident or injury is permitted to bring his or her own independent claim, courts will be flooded with these derivative claims, and defendants will be subject to liability that is disproportionate to their fault.

At the same time, as our society has come to better understand the nature of trauma and other forms of mental distress, a recognition has emerged that witnessing a horrific accident or injury can result in legitimate, serious emotional harm, harm that can be objectively diagnosed and that is deserving of compensation. As a result, courts have grappled with the best way to afford a remedy for a bystander's genuine emotional distress while placing reasonable limits on the scope of such liability.

Over the past century, three approaches have, successively, represented the majority approach to this issue in the United States. Initially, most jurisdictions fol-

lowed the impact rule, in which a bystander can recover for emotional injuries only when he or she was personally physically impacted by the accident in which the primary victim was injured. Although this rule initially was viewed as providing some guarantee of the genuineness and seriousness of a bystander's alleged emotional distress, it since has been abandoned in nearly every jurisdiction as both over and under inclusive.

Beginning in the 1930s, many states replaced the impact rule with a zone of danger rule, under which a bystander may bring a claim for emotional distress as long as he or she is placed in personal physical danger by the defendant's negligence, even if no physical impact actually occurs. As with the impact rule, however, the zone of danger rule often leads to seemingly arbitrary results, and fewer than one dozen states have retained the rule as their primary source of liability for bystander emotional distress claims.

Instead, beginning with the seminal California case of *Dillon* v. *Legg*, 68 Cal. 2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968), nearly three fourths of the states have adopted some form of what has come to be known as the rule of reasonable foreseeability. Under this rule, which applies traditional principles of tort law in the bystander context, a bystander to a negligently caused injury or accident may recover for his or her own emotional distress whenever it is reasonably foreseeable that the defendant's negligence will result in such harm. See, e.g., id., 739–41. In *Dillon*, for example, the California Supreme Court held that a mother, who was not herself in the zone of danger, could recover for the emotional distress she experienced upon observing a motorist strike and kill her infant daughter, who was crossing the road. Id., 731–32, 741. Since *Dillon*, courts in California and elsewhere have worked to develop a set of rules or guidelines to identify when a bystander's distress may be deemed reasonably foreseeable as a matter of law. In most jurisdictions, in defining the circumstances under which a bystander is entitled to recover for such harm, courts have sought to restrict liability for such claims to cases in which there can be some confidence that the alleged injuries are (1) the direct result of the defendant's negligence, (2) both genuine and serious, and (3) inflicted on persons who reasonably could be expected to suffer severe emotional distress in response to the injury or death of the primary victim.

When *Dillon* was decided, Connecticut did not recognize a cause of action for bystander emotional distress, even for those in the zone of danger. See, e.g., *Strazza* v. *McKittrick*, 146 Conn. 714, 719, 156 A.2d 149 (1959) ("there can be no recovery for nervous shock and mental anguish caused by the sight of injury or threatened harm to another"), overruled in part by *Clohessy* v. *Bachelor*, 237 Conn. 31, 675 A.2d 852 (1996). More than

one decade after *Dillon*, in *Amodio* v. *Cunningham*, 182 Conn. 80, 438 A.2d 6 (1980), the plaintiff, who claimed to have suffered emotional injuries when her daughter died after having been misdiagnosed by the defendant physicians, urged this court to adopt a reasonable foreseeability rule such as the one recognized in *Dillon*. See id., 81–82. In *Amodio*, we did not foreclose the possibility that we would, in the future, recognize a cause of action for bystander emotional distress. See id., 92. We declined to do so at that time, however, because we concluded that, even under *Dillon*, the plaintiff's claim could not satisfy the requirement that she directly observe a negligent act that contemporaneously caused injury to her child. See id., 92–93.

Subsequently, in *Maloney* v. *Conroy*, 208 Conn. 392, 393, 545 A.2d 1059 (1988), we again considered a case in which a plaintiff experienced emotional distress after observing the protracted effects of medical malpractice on a family member. In *Maloney*, however, we went a step further than in *Amodio*, concluding that, "[w]hatever may be the situation in other contexts [in which] bystander emotional disturbance claims arise, we are convinced that, with respect to such claims arising from malpractice . . . we should return to the position we articulated in *Strazza* that there can be no recovery for nervous shock and mental anguish caused by the sight of injury or threatened harm to another." (Internal quotation marks omitted.) Id., 402. Finally, in *Clohessy*, we were presented with a motor vehicle accident scenario similar to that in *Dillon*. *Clohessy* v. *Bachelor*, supra, 237 Conn. 32–34; see *Dillon* v. *Legg*, supra, 68 Cal. 2d 731–32. After reviewing the law of our sister states and the various competing policy considerations; see *Clohessy* v. *Bachelor*, supra, 39–56; we recognized a cause of action for bystander emotional distress and adopted a version of the reasonable foreseeability approach to define the parameters of such claims. Id., 46, 56. With this background in mind, we now turn to the plaintiffs' claims and the parties' competing visions as to the proper scope of the bystander cause of action under Connecticut common law.[7]

I

Before we address whether the trial court correctly determined that there was no genuine issue of material fact as to the plaintiffs' alleged emotional distress, we first consider the predicate question of whether Connecticut recognizes a cause of action for bystander emotional distress arising out of medical malpractice. The defendants contend that we foreclosed such a cause of action in *Maloney* and that compelling public policy considerations continue to militate in favor of exempting health care providers from liability for purely emotional harms suffered by witnesses to medical malpractice. The plaintiffs, by contrast, maintain that our decision in *Clohessy* superseded *Maloney* and that the

standards that we imposed in *Clohessy* for the bringing of bystander emotional distress claims govern all negligence actions, including those sounding in medical malpractice. The plaintiffs also maintain that, if properly cabined, claims of bystander emotional distress may be recognized in the health care context without unduly burdening the practice of medicine. We conclude that, under certain very limited circumstances, Connecticut does recognize a cause of action for bystander emotional distress resulting from medical malpractice.

The parties recognize that, in addressing this issue, we do not write on a blank slate. In *Maloney*, we held that a bystander to medical malpractice may not recover for emotional distress. *Maloney* v. *Conroy*, supra, 208 Conn. 393, 402. In so holding, however, we relied in part on the fact that, at that time, we had not yet recognized a cause of action for bystander emotional distress in *any* context. See id., 399–400. We emphasized that we had declined to recognize such a claim in *Strazza*, and that the Restatement (Second) of Torts expressly disavowed the applicability of emotional distress claims in the bystander context. Id. In declining to follow jurisdictions such as California, which had begun to permit bystander claims arising out of medical malpractice, we expressed concerns that, for the most part, apply with equal force to all bystander emotional distress claims. See, e.g., id., 397 (noting difficulty of tracing etiology of emotional distress); id., 397–98 (noting risk that judicial system will be inundated by flood of trivial, imagined or falsified claims); id., 399 (noting difficulty of establishing causation with respect to whether emotional distress derives from witnessing of injury or simply ordinary grief stemming from loss or suffering of loved one). Moreover, where our analysis in *Maloney* did hinge on considerations unique to the medical malpractice context, we focused on the distinct factual scenario presented by that case: a family member, sitting at the bedside of a loved one over the course of days or weeks, has a prolonged opportunity to observe the patient's gradual deterioration as a result of substandard medical care. See id., 402 ("allowing . . . plaintiff[s] to bring actions for emotional disturbance based [on] their observation of the course of treatment of an alleged malpractice victim *over an extended period of time* . . . demonstrates . . . the ineffectiveness of . . . guidelines [adopted by states such as California] in screening out claims of any family member for the grief he has suffered from the loss of a loved one" [emphasis added]); id. (allowing recovery by one who has been constantly at patient's bedside could lead hospitals to curtail visitation hours). In *Maloney*, then, we neither confronted nor addressed the scenario presented in the present case, in which a bystander witnesses the immediate and jarring aftermath of a single, discrete medical decision that results in a sudden, traumatic injury that ultimately leads to the primary vic-

tim's death.

We returned to the issue of bystander liability eight years later in *Clohessy*, in which we expressly overruled *Strazza* and recognized for the first time a cause of action for bystander emotional distress. *Clohessy* v. *Bachelor*, supra, 237 Conn. 46, 56. In *Clohessy*, we observed that, whereas "the nearly unanimous weight of authority" in 1959 had deemed such distress to be unredressable; id., 38; over the following four decades, many jurisdictions had begun to recognize bystander emotional distress claims under either the zone of danger or reasonable foreseeability theories. See id., 38–44. We adopted a variant of the latter rule because (1) it had been adopted by the majority of jurisdictions to have recognized bystander emotional distress claims, (2) it comports with the general emphasis on the foreseeability of harm that animates the law of tort, and (3) we deemed it to be fairer, and less arbitrary, than the zone of danger rule. Id., 47–49.

Because the negligence alleged in *Clohessy* did not arise from medical malpractice, we did not have occasion in that case to consider whether, in overruling *Strazza*, we also overruled *Maloney* by implication. The plaintiffs contend that we did. The defendants, by contrast, maintain that *Maloney* remains good law and that *Clohessy* opened the door only to those bystander claims arising from ordinary negligence. We agree with the plaintiffs that the most reasonable reading of our decision in *Clohessy* is that that case superseded *Maloney* and recognized a cause of action for bystander emotional distress sufficiently expansive to encompass medical malpractice along with other types of negligence. We reach this conclusion for four reasons.

First, as the plaintiffs note, when we first recognized a cause of action for bystander emotional distress in *Clohessy*, we did so using language broad enough to encompass all species of negligence: "We . . . conclude, on the basis of sound public policy and principles of reasonable foreseeability, that a plaintiff should be allowed to recover, within certain limitations, for emotional distress as a result of harm done to a third party." Id., 49. We then described at length the limitations to be imposed on bystander emotional distress claims— restrictions on both the types of harms involved and the potential class of plaintiffs—without any suggestion that bystanders to medical malpractice were to be excluded. See id., 51–56. We summarized the new rule as follows: "[A] bystander may recover damages for emotional distress under the rule of reasonable foreseeability if the bystander satisfies the following conditions: (1) he or she is closely related to the injury victim, such as the parent or the sibling of the victim; (2) the emotional injury of the bystander is caused by the contemporaneous sensory perception of the event or conduct that causes the injury, or by arriving on the scene

soon thereafter and before substantial change has occurred in the victim's condition or location; (3) the injury of the victim must be substantial, resulting in his or her death or serious physical injury; and (4) the bystander's emotional injury must be serious, beyond that which would be anticipated in a disinterested witness and which is not the result of an abnormal response." Id., 56. Having discussed at some length our erstwhile reluctance to recognize bystander emotional distress claims arising out of medical malpractice; see id., 37–38; we declined to carve out any such exception.

Second, in defining the elements necessary to assert a claim for bystander emotional distress in *Clohessy*, we relied on cases from both Connecticut and other jurisdictions in which the underlying act of negligence was either medical malpractice or ordinary negligence in the provision of medical care: on six separate occasions, for example, the court in *Clohessy* cited to or quoted from *Lejeune* v. *Rayne Branch Hospital*, 556 So. 2d 559 (La. 1990). *Clohessy* v. *Bachelor*, supra, 237 Conn. 49–51 and nn.11 and 13, 53–54, 56. In *Lejeune*, in which the Louisiana Supreme Court reversed one century of precedent and first recognized a cause of action for bystander emotional distress, the plaintiff's wife allegedly suffered emotional distress upon discovering that the defendant hospital negligently had allowed rats to bite her comatose husband. *Lejeune* v. *Rayne Branch Hospital*, supra, 561, 571. In *Clohessy*, we also cited repeatedly to *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 496, 408 A.2d 260 (1979), the case in which this court first recognized a cause of action for the loss of spousal consortium arising out of medical malpractice. *Clohessy* v. *Bachelor*, supra, 51 n.12, 52, 54, 57. Of particular note, of the three cases on which we relied in *Clohessy* in discussing the types of injuries that the primary victim must suffer before liability for bystander emotional distress may be imposed, two involved allegations of malpractice or negligence on the part of health care providers. See id., 53–54 (citing to *Lejeune* and *Hopson*).

Third, when we discussed *Maloney* in *Clohessy*, we did not characterize our decision in the former case as having imposed a per se rule exempting health care providers from liability for bystander emotional distress. Rather, we simply noted that, "when the underlying act of negligence . . . is medical malpractice . . . there *generally* is no significant observable sudden traumatic event by which the effect [on] the bystander can be judged." (Emphasis added.) Id., 44. In *Maloney*, for example, the plaintiff had observed her mother's gradual deterioration, allegedly as a result of the defendants' ongoing negligent failure to address her medical needs. See *Maloney* v. *Conroy*, supra, 208 Conn. 394. In *Clohessy*, we implicitly left open the possibility that liability for bystander emotional distress could be imposed in a different case when the alleged medical

malpractice consists of a significant, sudden and contemporaneously observable[8] traumatic event.[9]

Fourth, the defendants' interpretation fails to take account of the credence that we paid in *Clohessy* to the development of the law of bystander emotional distress in other jurisdictions. When contemplating issues of first impression with regard to Connecticut's common law, we often have sought to benefit from the collective wisdom and experience of our sister states. See, e.g., *Stafford* v. *Roadway*, 312 Conn. 184, 193, 93 A.3d 1058 (2014). In *Clohessy*, we emphasized that our jurisprudence in this relatively novel area of the law has prompted us to look for guidance to the evolving consensus of our sister states. See *Clohessy* v. *Bachelor*, supra, 237 Conn. 43–44. In *Clohessy*, for example, we noted that we declined to recognize a cause of action for bystander emotional distress in *Strazza* largely on the basis of the state of the law in other jurisdictions at that time. Id., 38, 44; see *Strazza* v. *McKittrick*, 146 Conn. 719. By the same token, when, in *Clohessy*, we adopted the foreseeability approach to bystander emotional distress first articulated by the California Supreme Court in *Dillon*, we did so mindful of the fact that a substantial school of thought had since emerged in favor of that approach; see *Clohessy* v. *Bachelor*, supra, 38, 43–44; and that the foreseeability rule had come to be favored by "[a] majority of the commentators and a growing number of jurisdictions . . . ." Id., 49; see also id., 49–50 and n.11 (joining twenty-four other jurisdictions that had adopted rule); cf. id., 51 (imposing limitations on liability on basis of experience of other jurisdictions). As we explain more fully hereinafter, the vast majority of jurisdictions following the foreseeability rule with respect to bystander emotional distress have concluded that, under appropriate circumstances, such claims may be brought in the context of medical malpractice. Accordingly, we believe that to adopt a per se rule denying all bystander emotional distress claims arising from medical malpractice would run counter to both the letter and the spirit of our decision in *Clohessy*.

For the foregoing reasons, we conclude that our statement in *Maloney*, in which we had not recognized a cause of action for bystander emotional distress in *any* context, that such claims were not then cognizable in the context of medical malpractice, did not survive *Clohessy*, in which we recognized and defined the parameters of bystander emotional distress claims in general. See id., 52–56. This conclusion is consistent with our recent statement in *Jarmie* v. *Troncale*, 306 Conn. 578, 50 A.3d 802 (2012), eschewing any "per se rule that [third-party tort] claims are categorically barred because of the absence of a physician-patient relationship . . . ." Id., 593 n.5.

We next consider the defendants' claim that, regard-

less of our precedents, there are compelling public policy reasons why we should now preclude bystander emotional distress claims arising from alleged medical malpractice. Specifically, the defendants and their amicus contend that permitting such claims would (1) increase the financial burden on health care providers, in contravention of Connecticut public policy, (2) compel health care providers to curtail visitation rights in order to reduce the chance that there will be a witness to any particular instance of medical malpractice, (3) interfere with the provider-patient relationship, such as by forcing providers to attend to the needs and concerns of third parties at the expense of patient care, and (4) cause medical providers to second-guess their own professional judgments in favor of accommodating the needs and concerns of third parties. Although such fears are not entirely unfounded, we conclude that they can be adequately addressed by fashioning a legal test that sufficiently restricts the types of bystander emotional distress claims that can be predicated on medical malpractice.

We begin by observing that, to our knowledge, only one American jurisdiction that follows a foreseeability approach[10] to bystander emotional distress claims, namely, Texas, has excluded as a matter of state common law all such claims arising from medical malpractice. See *Edinburg Hospital Authority* v. *Trevino*, 941 S.W.2d 76, 81 (Tex. 1997) (Texas precludes recovery for bystander claims in medical malpractice cases). The legislatures of two other states have barred such claims by statute. See *Branom* v. *State*, 94 Wn. App. 964, 975, 974 P.2d 335 (negligent infliction of emotional distress claims arising out of medical malpractice are barred by Washington statute), review denied, 138 Wn. 2d 1023, 989 P.2d 1136 (1999); *Finnegan ex rel. Skoglind* v. *Wisconsin Patients Compensation Fund*, 263 Wis. 2d 574, 591, 666 N.W.2d 797 (2003) ("negligent infliction of emotional distress claims arising out of medical malpractice are not actionable under Wisconsin law"). By contrast, many, if not most, of those jurisdictions that follow the foreseeability approach expressly permit witnesses to at least some types of medical malpractice to bring bystander emotional distress claims.[11] We have no reason to believe that those states have suffered the parade of horribles that the defendants and their amicus envision. Nor are we overly concerned that the remote specter of bystander emotional distress claims will lead hospitals to banish the expectant father from the delivery room, or children from the bedside of an ailing parent.

Of greater concern is the "troublesome question of causation" that we addressed in *Maloney*.[12] *Maloney* v. *Conroy*, supra, 208 Conn. 399. In fact, bystander claims arising from alleged medical malpractice raise two distinct but related problems with regard to causation. The first problem is that laypeople are, for the most

part, unqualified to identify medical malpractice or determine whether a particular medical procedure, decision or diagnosis complies with the prevailing standard of care. Cf. *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 567–68, 864 A.2d 1 (2005). Moreover, the provision of health care services is replete with uncomfortable, disturbing and, at times, even excruciating modalities and decisions that may be medically necessary and perfectly appropriate but that are beyond the ken of the lay observer. To a significant extent, then, medical malpractice differs from the typical bystander scenario, such as an automobile accident, in which a lay witness is able to simultaneously assess that (1) something has gone terribly awry, and (2) the error is the cause of the resulting injuries to the primary victim. In the health care setting, by contrast, bystanders may witness severe injuries that are deeply disturbing but that are not the result of negligence; conversely, bystanders may witness instances of professional negligence, the nature or results of which are not readily apparent.

The second problem regarding causation is that, in a case of medical malpractice, it may be difficult, if not impossible, to determine whether the extreme emotional disturbance suffered by close relatives of a patient stems from their having witnessed the tortious conduct or simply from their natural concern over the illness and suffering of a loved one. Of course, this problem is not unique to the health care setting. Parents whose child is injured or killed by a negligent driver likely will suffer emotional distress regardless of whether they witness the accident directly. The problem is magnified in the medical arena, however, because many victims of medical malpractice are already suffering from some malady when the tortious conduct occurs; that is precisely why they have sought medical care. In some percentage of these cases, moreover, the malady would have culminated in severe injury or death regardless of any medical intervention or error. Thus, the trier of fact is faced with the daunting task of determining the extent to which the bystander's emotional distress is the result of witnessing professional negligence, as opposed to the ordinary distress a person feels when a loved one is ill.

A number of jurisdictions have addressed these concerns by adopting the rule that bystander claims arising from medical malpractice are cognizable only in those rare cases in which the medical mistake is the result of gross negligence such that it would be readily apparent and independently traumatizing to a lay observer. In *Pollock* v. *Ottumwa Regional Mobile Intensive Care Services*, Iowa Court of Appeals, Docket Nos. 0-631, 00-0040 (Iowa App. December 13, 2000), for instance, the court allowed a bystander claim to go forward when the plaintiff had watched emergency medical technicians cause her husband to fall or roll off an ambulance cot

during transport. "In most cases," the court explained, "a layman can have no knowledge whether the proper medicine was administered or the proper surgical treatment was given. . . . However, it is a matter of common knowledge and observation that some things do not ordinarily attend the service of one possessing ordinary skill and experience in a medical or other professional field. One does not need scientific knowledge or special training to understand that, ordinarily speaking, certain results are unnecessary and are not to be anticipated, if reasonable care is exercised by the operator. . . .

"There are medical and professional malpractice cases [in which] the fact there was a negligent occurrence or event is so obvious as to be within the comprehension of laypersons and requires only common knowledge and experience. See *Wiles* v. *Myerly*, 210 N.W.2d 619 [621–22] (Iowa 1973) (patient came out of vascular operation with a part of his body burned that was not within the area of the operation). There is no rule that the nature of an injury must be shown by expert testimony if the injury is such that it may satisfactorily be shown by other evidence." (Citations omitted; emphasis omitted.) *Pollock* v. *Ottumwa Regional Mobile Intensive Care Services*, supra, Iowa Court of Appeals, Docket Nos. 0-631, 00-0040. California courts likewise have limited bystander recovery to blatant medical errors, such as neglecting to care for a patient whose symptoms obviously require immediate attention, or mistakenly amputating a healthy limb; *Bird* v. *Saenz*, 28 Cal. 4th 910, 918–20, 51 P.3d 324, 123 Cal. Rptr. 2d 465 (2002); concluding that errors of this sort do not lie beyond the "understanding awareness of a layperson." Id., 920; see also *Smelko* v. *Brinton*, 241 Kan. 763, 773–74, 740 P.2d 591 (1987) (following California approach).

We believe that such a rule strikes an appropriate balance. It permits recovery by those traumatized from witnessing vulnerable loved ones seriously injured by gross misconduct on the part of health care providers. At the same time, the rule recognizes that laypeople are not qualified to assess whether most types of medical judgments and procedures meet the relevant standard of care. It thus avoids unnecessarily multiplying claims and minimizes interference with the provider-patient relationship.

The rule adopted by these jurisdictions also conforms with the principle, well established in Connecticut, that, although expert testimony usually is necessary to establish medical malpractice, such testimony is not required in those cases in which the professional negligence is "so gross as to be clear even to a [layperson]." (Internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, supra, 272 Conn. 567. In *Boone*, we indicated that errors such as leaving foreign objects in a patient's

body after surgery, or administering medications or biomaterials that are prominently labeled as unsuitable for a particular patient, could satisfy "the high threshold of egregiousness necessary to fall within [this] gross negligence exception." Id., 567–68. Similarly, when a bystander claims to have been traumatized by witnessing this sort of grossly negligent treatment of a loved one, there is far less of a concern than with other types of medical malpractice regarding the etiology of the resultant emotional distress. Accordingly, we hold that, subject to the four conditions we established in *Clohessy*; *Clohessy* v. *Bachelor*, supra, 237 Conn. 56; a bystander to medical malpractice may recover for the severe emotional distress that he or she suffers as a direct result of contemporaneously observing gross professional negligence such that the bystander is aware, at the time, not only that the defendant's conduct is improper but also that it will likely result in the death of or serious injury to the primary victim.

In the present case, the plaintiffs alleged that the defendants prematurely and improperly discharged Stephen, a patient who was imminently suicidal and who had a long-standing psychiatric history that was known to the defendants. We are unable to conclude, as a matter of law, that a hospital that discharges a potentially suicidal patient under the circumstances alleged could not have demonstrated gross negligence in so doing, when the patient then proceeded to take his own life shortly after discharge. See, e.g., *DeJesus* v. *Dept. of Veterans Affairs*, 479 F.3d 271, 288 (3d Cir. 2007); *Danese* v. *Asman*, 670 F. Supp. 709, 719 (E.D. Mich. 1987); *Boice* v. *Tyler Memorial Hospital*, United States District Court, Docket No. 3:CV-06-1709 (M.D. Pa. September 28, 2007); *Moczydloski* v. *First Hospital Corp.*, 19 Pa. D. & C.4th 259, 261–62 (Com. Pl. 1993). Accordingly, we reject the defendants' argument that the plaintiffs have not stated a cognizable claim for bystander emotional distress merely because their action arises out of alleged medical malpractice.[13]

II

We next consider whether the trial court, in granting the defendants' motion for summary judgment as to the bystander emotional distress claim, correctly concluded that there was no genuine issue of material fact as to whether the plaintiffs suffered severe and debilitating emotional distress as a result of the defendants' alleged negligence. On appeal, the plaintiffs argue that (1) the trial court failed to apply the correct legal standard for claims of bystander emotional distress, and (2) in any event, their allegations, together with the evidence in the record, were sufficient to survive a motion for summary judgment under the legal standard that the trial court applied. We disagree with these contentions.

A

We begin by clarifying the legal standard governing claims of bystander emotional distress. In *Clohessy*, we held that a bystander to an accident or injury caused by the negligence of a third party may bring an independent claim for his or her own emotional distress when (1) the bystander is closely related to the primary victim of the accident or injury, (2) the bystander's emotional distress is caused by the contemporaneous sensory perception of the event or conduct that causes the accident or injury, or by arriving on the scene soon thereafter and before substantial change has occurred in the primary victim's condition or location, (3) the primary victim dies or sustains serious physical injury, and (4) the bystander experiences serious emotional distress as a result. *Clohessy* v. *Bachelor*, supra, 237 Conn. 52–56. At issue in the present appeal is the standard governing the fourth prong of the test, namely, the type and degree of emotional distress that a bystander must suffer as a result of witnessing the death or serious physical injury of a loved one.

In *Clohessy*, we described the fourth prong of the test as follows: "[T]he plaintiff bystander must have sustained a serious emotional injury—that is, *a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstance. . . .* This injury may be purely emotional and need not manifest itself physically. See *Delott* v. *Roraback*, 179 Conn. 406, 409, 426 A.2d 791 (1980) ([a] plaintiff may recover damages in a personal injury action for pain and suffering even when such pain and suffering is evidenced exclusively by the plaintiff's subjective complaints); *Leong* v. *Takasaki*, 55 Haw. 398, 408, 520 P.2d 758 (1974) (serious emotional distress may properly be found [when a] reasonable person normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances); *Folz* v. *State*, 110 N.M. 457, 470, 797 P.2d 246 (1990) (illogical to require as a threshold element the presence of physical injury to manifest the emotional trauma induced by the contemporaneous sensory perception of the death or physical injury of a close loved one); *Sorrells* v. *M.Y.B. Hospitality Ventures of Asheville*, 334 N.C. 669, 672, 435 S.E.2d 320 (1993) ([the] plaintiff must show an emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition [that] may be generally recognized and diagnosed by professionals trained to do so); *Paugh* v. *Hanks*, [6 Ohio St. 3d 72, 78, 451 N.E.2d 759 (1983)] (serious emotional distress may be found [when] a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case); *Sinn* v. *Burd*, [486 Pa. 146, 168, 404 A.2d 672 (1979)] (in agreement with [*Leong*]); *Boyles* v. *Kerr*, 855 S.W.2d 593, 598 (Tex. 1993) ([w]e also are not impos-

ing a requirement that emotional distress manifest itself physically to be compensable); *Heldreth* v. *Marrs*, [188 W. Va. 481, 490, 425 S.E.2d 157 (1992)] (Serious emotional distress [that] results from witnessing a closely related person critically injured or killed can be, in some cases, as debilitating and as severe as a physical injury. More importantly, serious emotional distress can be diagnosed even in the absence of any physical manifestation, and can be proven with medical and psychiatric evidence.); *Culbert* v. *Sampson's Supermarkets, Inc.*, 444 A.2d 433, 438 (Me. 1982) (proof of physical manifestations of the mental injury is no longer required); *Bowen* v. *Lumbermens Mutual Casualty Co.*, [183 Wis. 2d 627, 653, 517 N.W.2d 432 (1994)] (plaintiff need not prove physical manifestation of severe emotional distress). Serious emotional distress, of course, goes well beyond simple mental pain and anguish. *Compensation for mental pain and anguish over injury to a third person should . . . be allowed* [*only when*] *the emotional injury is both severe and debilitating.* . . . A nonexhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia and shock. . . .

"To summarize, we conclude that a bystander may recover damages for emotional distress under the rule of reasonable foreseeability if . . . the bystander's emotional injury [is] serious, *beyond that which would be anticipated in a disinterested witness* and which is not the result of an abnormal response." (Citations omitted; emphasis added; internal quotation marks omitted.) *Clohessy* v. *Bachelor*, supra, 237 Conn. 54–56.

The plaintiffs maintain that the highlighted language in the first and last sentences of this quoted passage indicates that a bystander need only demonstrate that his or her emotional distress exceeded that which would be anticipated in a disinterested witness. This relatively lax standard would, presumably, be met in the vast majority of cases in which the other prongs of the *Clohessy* test are satisfied, because it is normal to experience greater distress upon witnessing the death or serious injury of a close relative than upon seeing a stranger or mere acquaintance suffer the same fate.

By contrast, the defendants contend, and the trial court agreed, that the controlling legal standard is actually the more stringent requirement indicated by the highlighted language at the end of the first quoted paragraph. Specifically, the trial court in the present case interpreted *Clohessy* to mean that a bystander has a viable cause of action only when he or she suffers emotional injuries that are both severe and debilitating. The defendants emphasize that several of the parenthetical statements in the quoted passage from *Clohessy* suggest that, to be cognizable, the psychological injuries must render the bystander "unable to cope . . . ." (Internal quotation marks omitted.) The defendants fur-

ther note that, in *Clohessy*, we indicated that the psychological trauma involved must be akin to a diagnosable mental illness such as neurosis, psychosis, chronic depression, phobia or shock. Therefore, the defendants submit that, when the relevant portion of *Clohessy* is read in its entirety, the standard of emotional distress "beyond that which would be anticipated in a disinterested witness"; *Clohessy* v. *Bachelor*, supra, 237 Conn. 56; must be construed to mean mental pain and anguish that is almost unbearable and renders the bystander unable to cope with the challenges of daily life.

We agree with the defendants that a bystander cause of action will lie only when the bystander's psychological injuries are both severe and debilitating, such that they warrant a psychiatric diagnosis or otherwise substantially impair the bystander's ability to cope with life's daily routines and demands. We reach this conclusion for three reasons.

First, as the defendants note, if the law were to require only that a bystander suffer somewhat more than an impartial observer might be expected to, virtually every claim that satisfies the first three *Clohessy* requirements also would meet the fourth prong of the test, which would thus be rendered extraneous. This is because most people will naturally be more disturbed by witnessing the serious injury or death of a spouse, parent, child or sibling than that of a stranger or casual acquaintance. See, e.g., *Portee* v. *Jaffee*, 84 N.J. 88, 98–99, 417 A.2d 521 (1980). In *Clohessy*, this court, like the courts of other jurisdictions to have considered the issue, sought to strike a delicate balance between affording a remedy for those bystanders who are traumatized by observing a serious injury to a loved one, while at the same time carefully circumscribing the scope of potential liability. See *Clohessy* v. *Bachelor*, supra, 237 Conn. 50. The plaintiffs' interpretation of the fourth prong of *Clohessy* would mean that virtually every bystander who sees a family member suffer a serious injury would have a claim against a party whose negligence caused the injury, even if the bystander's distress ultimately proved short-lived and did not substantially impair his or her mental health or ability to function in the world. The benefits to society of providing legal recourse for such harms do not justify the costs.

The second reason we agree with the defendants that a bystander's emotional distress must be both severe and debilitating is that the more lenient standard advocated by the plaintiffs is impracticable and fails to provide sufficiently clear guidance as to what sorts of injuries the law is prepared to recognize. In *Clohessy*, we stated that a "nonexhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia and shock." (Internal quotation marks omitted.) Id., 56. Those conditions con-

stitute diagnosable mental disorders. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th Ed. 2013) pp. 87–122 (psychotic disorders); id., pp. 160–88 (depressive disorders); id., pp. 197–223 (phobias).[14] The fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) defines a "mental disorder" in relevant part as "a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning." Id., p. 20. The DSM-5 further explains that "[m]ental disorders are usually associated with significant distress or disability in social, occupational, or other important activities." Id. In other words, the types of psychological injuries that the law is prepared to recognize in the bystander context are those that result in a clinically significant impairment of one's ability to function in the world.

Although a formal psychiatric diagnosis is not always necessary to establish that a bystander has suffered emotional harms of this nature, there are several practical reasons to restrict bystander emotional distress claims to psychological injuries that are on a par with diagnosable mental disorders. As we previously noted, by affording a remedy only for those plaintiffs who have suffered severe and disabling emotional distress, the law ensures that resources will not be spent litigating fraudulent or spurious claims and also that liability will be imposed on defendants only for those emotional harms that are truly substantial. In addition, the standard advocated by the defendants establishes a lodestar for navigating the murky waters of emotional distress and mental illness. The requirement that the emotional distress that a bystander suffers either (1) warrants a psychiatric diagnosis, or (2) otherwise substantially impairs the bystander's ability to cope with life's daily routines and demands provides relatively clear guidance as to the type and degree of emotional distress necessary for bystander liability to be imposed. By contrast, the finder of fact would be hard put to determine with any confidence whether particular plaintiffs have suffered emotional injuries "beyond that which would be anticipated in a disinterested witness . . . ." *Clohessy* v. *Bachelor*, supra, 237 Conn. 56. Few people, for instance, ever will have the misfortune of witnessing a suicide in progress, let alone trying in vain to revive a dying stranger. One would expect that the reactions of ordinary people to such an experience will run the gamut, and that some not insignificant percentage will suffer from ongoing symptoms such as anxiety, insomnia, recurring imagery and other indicia of post-traumatic stress, notwithstanding the absence of a close personal relationship with the victim. To determine whether the emotional distress that the plaintiffs experienced fell within or exceeded this spectrum of suffering

requires a judgment that is almost hopelessly subjective.

The third reason we conclude that the fourth prong of *Clohessy* restricts liability to emotional harms that are both severe and debilitating is that our review of the law of the roughly three dozen states that have embraced a foreseeability approach to bystander emotional distress claims indicates that a majority of those jurisdictions has adopted a standard for emotional distress at least as exacting as that advocated by the defendants. More than one dozen jurisdictions now impose a standard akin to that urged by the defendants, requiring that a bystander suffer emotional injuries that are disabling or that render the bystander unable to cope with the challenges of daily life.[15] In addition, at least sixteen other states impose an even higher standard, hewing to the more traditional rule that claims of bystander emotional distress are cognizable only when the emotional distress is so severe that it has manifested in the form of a physical ailment.[16] By contrast, only six jurisdictions appear to have adopted a more liberal standard such as the one advocated by the plaintiffs, pursuant to which a bystander need only demonstrate that he or she has suffered some degree of temporary shock, fright or comparable emotional distress.[17]

We find especially noteworthy the fact that courts of other jurisdictions have interpreted the same "emotional distress beyond that which would be anticipated in a disinterested witness" language that we adopted in *Clohessy* to require injuries that render the bystander psychologically disabled or unable to cope. The cited language originated in the decision of the California Supreme Court in *Thing* v. *La Chusa*, 48 Cal. 3d 644, 668, 771 P.2d 814, 257 Cal. Rptr. 865 (1989).[18] In a footnote immediately following the court's statement of the "disinterested witness" standard, the court elaborated that "[a]s . . . the Hawaii Supreme Court [has explained], 'serious mental distress may be found [when] a reasonable [person], normally constituted, would be unable to adequately cope with the mental distress engendered by the circumstances of the case.' " Id., 668 n.12, quoting *Rodrigues* v. *State*, 52 Haw. 156, 173, 472 P.2d 509 (1970). The Supreme Court of Appeals of West Virginia, in adopting the disinterested witness language, likewise suggested that, to satisfy the requirement, the emotional harm that a bystander suffers must be "both severe and debilitating." (Internal quotation marks omitted.) *Heldreth* v. *Marrs*, supra, 188 W. Va. 490.

The plaintiffs have failed to articulate any compelling rationale for construing the standard that we articulated in *Clohessy* more liberally than have these courts. Accordingly, we now clarify that, to satisfy the fourth prong of the *Clohessy* test and assert a valid claim for bystander emotional distress, a bystander must suffer emotional distress that is severe enough either to war-

rant a psychiatric diagnosis or to otherwise substantially impair his or her ability to cope with life's daily routines and demands.

## B

Having clarified the legal standard for the requisite degree of emotional distress, we now consider whether the trial court, in granting the defendants' motion for summary judgment, correctly determined that the plaintiffs had failed to demonstrate that there was a genuine issue of material fact as to whether they had suffered such emotional distress. The plaintiffs contend that, even if they are required to demonstrate that their emotional distress was both severe and debilitating, the record contains sufficient evidence of such distress for their bystander claim to survive a motion for summary judgment. On appeal, the plaintiffs have pointed to three portions of the record that, they contend, create a genuine issue of material fact as to their emotional distress. We consider each in turn.[19]

First, at oral argument before this court, the plaintiffs' counsel maintained that the allegations in the amended complaint were themselves sufficient to overcome a motion for summary judgment. In paragraph 39 of that complaint, the plaintiffs alleged that, "[a]s a result of contemporary sensory perception of observing and/or experiencing the hanging, the rescue from hanging, the administration of life support and ultimately [Stephen's] death, the plaintiffs have suffered extreme, substantial, serious and permanent emotional distress." The plaintiffs' position appears to be that, because the defendants have not submitted evidence that would *foreclose* the possibility that the plaintiffs suffered debilitating emotional distress, such as testimony that they were estranged from Stephen or were unfazed by his death, the defendants never met their burden of demonstrating that there was no genuine issue of material fact as to the fourth prong of the *Clohessy* test. Therefore, the plaintiffs contend, the trial court incorrectly determined that the onus was on them to proffer documentary evidence such as affidavits, police reports, medical records, bills or deposition transcripts to substantiate their claims of emotional distress.

The defendants, for their part, respond that, once they submitted evidence from the plaintiffs' deposition transcripts and interrogatories tending to show that the plaintiffs had not experienced the most common indicia of severe emotional distress, such as an inability to work or a need for ongoing medical or psychological care, the burden shifted to the plaintiffs to produce affidavits or other evidence affirmatively showing that their injuries were otherwise debilitating. To hold otherwise, the defendants contend, would be to place on the party seeking summary judgment the unreasonable, if not impossible, burden of having to rule out every possible source of material dispute suggested by the oppos-

ing party's pleadings. We agree with the defendants.

The standard by which we review a trial court's decision to grant a motion for summary judgment is well established. "Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact [however] a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact *together with the evidence disclosing the existence of such an issue.* . . . It is not enough . . . for the opposing party merely to assert the existence of such a disputed issue." (Citation omitted; emphasis added; internal quotation marks omitted.) *Great Country Bank* v. *Pastore*, 241 Conn. 423, 435–36, 696 A.2d 1254 (1997). "Mere assertions of fact, whether contained in a complaint or in a brief, are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." *Bartha* v. *Waterbury House Wrecking Co.*, 190 Conn. 8, 12, 459 A.2d 115 (1983).

As a general rule, then, "[w]hen a motion for summary judgment is filed and supported by affidavits and other documents, an adverse party, by affidavit or as otherwise provided by . . . [the rules of practice], must set forth specific facts showing that there is a genuine issue for trial, and if he does not so respond, summary judgment shall be entered against him." (Footnote omitted.) *Farrell* v. *Farrell*, 182 Conn. 34, 38, 438 A.2d 415 (1980). "Requiring the nonmovant to produce such evidence does not shift the burden of proof. Rather, it ensures that the nonmovant has not raised a specious issue for the sole purpose of forcing the case to trial." *Great Country Bank* v. *Pastore*, supra, 241 Conn. 436.

As the plaintiffs correctly note, however, one "important exception exists . . . to the general rule that a party opposing summary judgment must provide evidentiary support for its opposition . . . . On a motion by [the] defendant for summary judgment the burden is on [the] defendant to negate each claim as framed by the complaint . . . . It necessarily follows that it is only [o]nce [the] defendant's burden in establishing his entitlement to summary judgment is met [that] the burden shifts to [the] plaintiff to show that a genuine issue of fact exists justifying a trial. . . . Accordingly, [w]hen documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establish-

ing the existence of such an issue." (Citations omitted; internal quotation marks omitted.) *Rockwell* v. *Quintner*, 96 Conn. App. 221, 229–30, 899 A.2d 738, cert. denied, 280 Conn. 917, 908 A.2d 538 (2006).

The plaintiffs contend that there are many reasons why a person suffering from severe emotional distress may be reluctant to seek psychiatric treatment or to obtain a formal diagnosis of mental illness. Therefore, they argue, the plaintiffs' mere admission that they only took medication and sought counseling on a limited basis following Stephen's death did not rule out the possibility that they nevertheless had suffered severe and debilitating emotional distress as a result of witnessing his suicide.

Even if we were to assume that the plaintiffs, in alleging emotional distress that was "extreme" and "permanent," successfully pleaded severe and disabling emotional harm as we have defined it; see part II A of this opinion; we disagree that they could rely on those pleadings to defeat the defendants' motion for summary judgment. In their answer, the defendants did not admit the allegations contained in paragraph 39 but instead "[left] the plaintiffs to their proof." Subsequently, in their motion for summary judgment, the defendants maintained that "there is no genuine factual dispute that the plaintiffs' emotional injuries [were] not *debilitating*, as required under . . . [*Clohessy*]." (Emphasis in original.) In their supporting memorandum of law, the defendants emphasized that the plaintiffs failed to allege either that they had been diagnosed with any mental disorders or that their emotional distress had interfered with their ability to function on a day-to-day basis. Clearly, the defendants sought to broadly challenge the allegation that the plaintiffs had suffered severe emotional distress. The question is whether the evidence the defendants submitted in support of their motion for summary judgment was sufficient to shift the burden of production to the plaintiffs.

Attached as exhibits to the defendants' memorandum of law were excerpts of the deposition testimony of the plaintiffs, as well as their responses to the defendants' interrogatories. In Agnes Squeo's deposition, she testified that the only forms of psychiatric therapy or care that she had sought in the four years since Stephen's suicide were (1) attending a single family therapy session in which she discussed "the images that [she] had to deal with and the nightmares," (2) speaking informally with one of her students,[20] who was a social worker, and (3) periodically chatting with her pastor. Agnes Squeo further testified that, after initially taking prescription sleeping pills for a few days, she had taken no other medication for her emotional distress. In her interrogatory responses, Agnes Squeo declined to identify any physician, hospital, mental health professional, counselor or other person who had treated her emo-

tional distress. She further averred that she had been continuously employed as a fitness instructor during the period since Stephen's death and that she had not lost any wages as a result of her emotional distress.

In his deposition, Joseph Squeo testified that he had not sought any psychiatric or medical treatment for emotional distress from the time of Stephen's suicide in August, 2007, until July, 2011, when he sought treatment to, in his words, "take advantage of my [Veterans Administration] service connected disability . . . ." He further testified that he did attend two counseling sessions in August, 2011, and that, as of February, 2012, he intended to seek additional treatment for emotional distress. He conceded, however, that he had made no specific plans to resume counseling because "I have to fit it into my schedule, tight schedule." Joseph Squeo also testified that he never had taken any medication for his emotional distress. In his response to the defendants' interrogatories, Joseph Squeo indicated that he was not claiming any lost wages with respect to his employment as a fifth grade teacher and team leader.

We agree with the defendants that the deposition transcripts and interrogatory responses submitted in support of their motion for summary judgment were sufficient to call into question whether the plaintiffs had sustained severe and debilitating emotional harm as a result of the defendants' alleged negligence, thereby requiring the plaintiffs to set forth specific facts demonstrating a genuine issue of material fact with respect to that issue. Although a psychiatric diagnosis is not required to satisfy the fourth prong of the *Clohessy* test, a person suffering from debilitating emotional injuries ordinarily would be expected to actively pursue some course of medical or psychological care. In addition, Agnes Squeo and Joseph Squeo admitted that they had remained steadily employed as a fitness instructor and an elementary school teacher/team leader, respectively, occupations generally known to require a fair degree of physical and emotional energy. Finally, Joseph Squeo testified that his "tight schedule" had not afforded him an opportunity to pursue mental health care.

The plaintiffs conceded that neither of them had experienced some of the most common indicia of severe emotional distress, namely, the need for ongoing mental health care and the inability to pursue their chosen vocations. This testimony suggests that the plaintiffs' emotional distress was not so extreme as to render them unable to navigate the other challenges of daily life. Accordingly, they could not continue to rely on their pleadings to defeat the defendants' motion for summary judgment but, instead, were obliged to submit affidavits or other documentary evidence in support of their claims. See Practice Book § 17-45. This they failed to do.

The plaintiffs' second argument is that, even if docu-

mentary evidence of severe emotional distress is ordinarily required under such circumstances, it was not necessary in view of the unique facts of this case because to witness the suicide of one's own child is deeply and inherently traumatic. In essence, the plaintiffs ask that we take judicial notice that for them to have witnessed Stephen's suicide, and tried in vain to save his life, could not have been anything other than extremely disturbing. The defendants, on the other hand, ask that we take notice of the fact that the plaintiffs, having lived for years with a son whom the defendants characterized as a "chronic high suicide risk patient," likely anticipated and were mentally prepared for the possibility that he would eventually take his own life.

We need not speculate, however, as to what shock and distress the plaintiffs may have experienced upon witnessing Stephen's hanging. Even if we assume that their experience was deeply disturbing, and we have no reason to doubt that it was, that alone is not sufficient to satisfy the legal standard that we have articulated today. Just as "few persons travel through life alone"; *Clohessy* v. *Bachelor*, supra, 237 Conn. 47; few of us complete the journey without ever suffering the loss of a parent, child, sibling or partner. The DSM-5, in defining a mental disorder, emphasizes that an "expectable or culturally approved response to a common stressor or loss, such as the death of a loved one, is not a mental disorder." American Psychiatric Association, supra, p. 20. We likewise conclude that, to survive a motion for summary judgment, the plaintiffs bore the burden of producing some evidence that the distress that they suffered as a result of witnessing the results of the defendants' alleged negligence was severe and debilitating, beyond the normal reaction of a parent to the horrific experience of losing a child. Merely alleging so in their complaint was not sufficient.

The plaintiffs' third argument is that, although they did not submit any affidavits or other documentary evidence in opposition to the defendants' motion for summary judgment, the documents that the *defendants* submitted are themselves sufficient to create a genuine issue of material fact. For example, the defendants submitted a portion of the transcript of Agnes Squeo's deposition, during which she testified that Joseph Squeo, upon discovering his son's hanging, screamed, "oh, my God, oh, my God." She also testified that she has experienced nightmares and "images," and that she has sought out informal counseling. The plaintiffs also testified that Joseph Squeo attended a few counseling sessions and plans to resume counseling in the future.

Although it is a close question, we do not believe that this testimony, standing alone, is enough to create a genuine issue of material fact as to whether the plaintiffs suffered severe and *debilitating* mental distress

such that they were unable to cope with the challenges of daily life. The evidence in support of the plaintiffs' claim is weaker even than the evidence that courts in other jurisdictions, applying a comparable standard, have deemed to be legally insufficient. In *Parrish ex rel. Parrish* v. *Omaha Public Power District*, 242 Neb. 731, 733, 496 N.W.2d 914 (1993), overruled in part on other grounds by *Gaytan* v. *Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014), for example, the Supreme Court of Nebraska considered the case of a ten year old girl whose father died in a construction accident. The girl cried so much that she suffered constant headaches, and her grades fell. Id. She visited a school counselor a few years after the accident but did not require or obtain any other medical or mental health treatment. Id., 733–34. The court concluded that the trial court properly granted the defendants' motion for summary judgment on her emotional distress claim: "Although we do not disregard or minimize the understandable anguish and enduring sadness that [the girl] experienced [upon] learning of her father's death, an action for emotional distress is a particular type of legal action which requires emotional distress . . . so severe that no reasonable person could have been expected to endure it and which is of sufficient severity that it is medically significant. . . . The record does not contain evidence in that regard . . . ." (Citation omitted; internal quotation marks omitted.) Id., 734; see *McCarthy* v. *Cleveland Heights*, 65 Ohio App. 3d 216, 218, 583 N.E.2d 981 (1989) (allegations that plaintiff became depressed, attended counseling for two months, and was incarcerated after provoking drunken confrontation with police was deemed to be insufficient to demonstrate severe and debilitating emotional distress as matter of law); see also *Held* v. *Aubert*, 845 So. 2d 625, 634–35 (La. App. 2003) (citing cases). In the present case, in light of the plaintiffs' admission that they were able to remain employed in physically and emotionally demanding careers, that neither needed significant medication or mental health care, and that Joseph Squeo had been unable to find time to schedule therapy sessions, the onus was on the plaintiffs to document some area of their lives in which witnessing Stephen's suicide has left them emotionally disabled. Although we are most sympathetic to their plight, we agree with the trial court that they failed to make the necessary evidentiary showing to defeat a motion for summary judgment.

The decision of the trial court to grant the defendants' summary judgment motion as to the plaintiffs' claim of negligent infliction of emotional distress is affirmed.

In this opinion the other justices concurred.

[1] Because, as the plaintiffs explain, some social stigma may be associated with a diagnosis of mental illness, the law does not require that a person bringing a bystander claim for emotional distress actually receive a formal diagnosis before asserting such a claim.

[2] As a result of Stephen's actions, and despite attempts by the plaintiffs

to administer cardiopulmonary resuscitation, Stephen suffered an anoxic brain injury. Stephen was placed on life support, which subsequently was withdrawn, shortly after which Stephen died.

[3] Unless otherwise noted, all references to the trial court are to the court, *Hon. Kevin Tierney*, judge trial referee.

[4] Although the operative complaint did not expressly allege that the defendants committed medical malpractice, it is clear from the allegations that the plaintiffs' claims sound in medical malpractice rather than in ordinary negligence. See *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 562–63, 864 A.2d 1 (2005) ("the relevant considerations in determining whether a claim sounds in medical malpractice are whether [1] the defendants are sued in their capacities as medical professionals, [2] the alleged negligence is of a specialized medical nature that arises out of the medical professional-patient relationship, and [3] the alleged negligence is substantially related to medical diagnosis or treatment and involved the exercise of medical judgment" [internal quotation marks omitted]).

[5] The first count was brought by Agnes Squeo, as fiduciary of the estate of Stephen. The second count, alleging bystander emotional distress, was brought by Agnes Squeo and Joseph Squeo in their individual capacities.

[6] After the plaintiffs amended their complaint, the defendants again moved to strike the second count on similar grounds. The court, *Hon. Taggart D. Adams*, judge trial referee, denied the motion on procedural grounds without reaching the merits.

[7] The Connecticut Trial Lawyers Association and the Connecticut Hospital Association have submitted briefs as amici curiae in support of the plaintiffs and the defendants, respectively.

[8] See footnote 13 of this opinion.

[9] It bears noting that, in *Maloney*, the defendants contended in their motion to strike, the granting of which formed the basis for the appeal in that case, not that liability for bystander emotional distress is precluded in medical malpractice actions but only that "[n]o cause of action exists for emotional distress arising from witnessing harm to another . . . ." *Maloney* v. *Conroy*, Supreme Court Records & Briefs, May Term, 1988, Pt. 4, Record p. 12. The trial court granted the motion on that basis. Id., p. 27 ("the rule . . . still prevails in this state . . . that there may be no recovery for emotional distress occasioned by fear of threatened harm to another").

[10] Bystander medical malpractice claims will rarely if ever arise under a zone of danger rule, as it is the rare form of medical malpractice that would pose a physical threat to bystanders. *Edinburg Hospital Authority* v. *Trevino*, 941 S.W.2d 76, 81 (Tex. 1997).

[11] See, e.g., *Bird* v. *Saenz*, 28 Cal. 4th 910, 917–22, 51 P.3d 324, 123 Cal. Rptr. 2d 465 (2002) (defining circumstances under which lay witness to malpractice may assert valid claim for bystander emotional distress); *Armstrong* v. *A.I. Dupont Hospital for Children*, 60 A.3d 414, 417, 426 (Del. Super. 2012) (permitting claim when parents observed hospital discharge unresponsive, postoperative child, who died hours later); *Ryan* v. *Brown*, 827 N.E.2d 112, 118 (Ind. App. 2005) (parents of stillborn baby permitted to bring claim against physician and hospital for negligent infliction of emotional distress); *Pollock* v. *Ottumwa Regional Mobile Intensive Care Services*, Iowa Court of Appeals, Docket Nos. 0-631, 00-0040 (Iowa App. December 13, 2000) (permitting claim when emergency medical technicians caused plaintiff's husband to fall from mobile cot); *Lejeune* v. *Rayne Branch Hospital*, supra, 556 So. 2d 561 (wife stated cause of action for bystander emotional distress arising from discovery that hospitalized comatose husband had sustained rat bites); *Nelson* v. *Flanagan*, 677 A.2d 545, 549 (Me. 1996) ("in an appropriate case a medical misdiagnosis may result in an allowable claim for [bystander emotional distress]"); *Wargelin* v. *Sisters of Mercy Health Corp.*, 149 Mich. App. 75, 79–80, 86–87, 385 N.W.2d 732 (1986) (parents of infant who died around time of or shortly after birth due to alleged malpractice of health care providers allowed to bring claim for bystander emotional distress); *Gendek* v. *Poblete*, 139 N.J. 291, 297, 654 A.2d 970 (1995) ("[c]laims for emotional distress that are either direct or indirect may arise when the negligence consists of medical malpractice"); *Crippens* v. *Sav On Drug Stores*, 114 Nev. 760, 762–63, 961 P.2d 761 (1998) (permitting claim arising from negligently dispensed pharmaceutical); *McAllister* v. *Ha*, 347 N.C. 638, 646, 496 S.E.2d 577 (1998) (permitting claim for negligent infliction of emotional distress arising from defendant physician's alleged failure to inform parents of certain test results when their infant son was born with sickle-cell disease); *McGill* v. *Newark Surgery Center*, 113 Ohio Misc. 2d 21, 27–28, 41–42, 756 N.E.2d 762 (Com. Pl. 2001) (husband was

permitted to bring claim after witnessing wife's death as result of hospital's allegedly negligent failure to provide emergency blood supply); *Bloom* v. *DuBois Regional Medical Center*, 409 Pa. Super. 83, 87, 106, 597 A.2d 671 (1991) (indicating that cause of action for bystander distress could lie when emergency room staff failed to diagnose and treat patient with appropriate expediency); see also *Thomas* v. *OB/GYN Specialists of the Palm Beaches, Inc.*, 889 So. 2d 971, 972 (Fla. App. 2004) (Florida recognizes narrow exception to impact rule for emotional distress suffered by parents of stillborn due to medical negligence), appeal dismissed, 912 So. 2d 320 (Fla. 2005); *Miles* v. *Edward O. Tabor, M.D., Inc.*, 387 Mass. 783, 788–89, 443 N.E.2d 1302 (1982) (claim for negligent infliction of emotional distress arising from physician's alleged malpractice was cognizable but failed because there was insufficient evidence of emotional distress at or around time of alleged malpractice); *Sell* v. *Mary Lanning Memorial Hospital Assn.*, 243 Neb. 266, 269–72, 498 N.W.2d 522 (1993) (claim arising from hospital's alleged negligence in mistakenly informing plaintiff that her son had died in accident was cognizable but failed due to lack of proof of severe emotional distress); *O'Donnell* v. *HCA Health Services of New Hampshire, Inc.*, 152 N.H. 608, 612, 883 A.2d 319 (2005) (claim for negligent infliction of emotional distress was cognizable but failed for lack of physical symptomology of plaintiff's distress); *Fernandez* v. *Walgreen Hastings Co.*, 126 N.M. 263, 270, 273, 968 P.2d 774 (1998) (claim for negligent infliction of emotional distress was cognizable but failed because plaintiff did not witness injury producing event); *Reilly* v. *United States*, 547 A.2d 894, 899 (R.I. 1988) (negligent infliction of emotional distress claim is cognizable upon proof that plaintiff has suffered physical symptomology in connection with emotional distress).

[12] We remain confident that the other concerns that we raised in *Maloney*, namely, "that recognition of a cause of action for [bystander emotional distress] when not related to any physical trauma may inundate judicial resources with a flood of relatively trivial claims, many of which may be imagined or falsified, and that liability may be imposed for [the] highly remote consequences of a negligent act"; *Maloney* v. *Conroy*, supra, 208 Conn. 397–98; are addressed adequately by the conditions that we imposed in *Clohessy* on all bystander emotional distress claims.

[13] We note that the plaintiffs apparently did not become aware that the defendants had discharged Stephen until approximately thirty-five minutes after the fact, by which time he had left the scene of the allegedly tortious conduct and walked from the hospital to the plaintiffs' home. Because the parties have not raised the issue, however, we need not decide whether, as a matter of law, allegations such as these could satisfy the direct, contemporaneous perception requirement that we imposed in *Clohessy*; *Clohessy* v. *Bachelor*, supra, 237 Conn. 56; particularly in light of the restrictions that we have imposed on bystander claims in the medical malpractice context. We emphasize, moreover, that the contemporaneous perception requirement is an important limitation on any claim for bystander emotional distress, and the plaintiffs would be required to demonstrate why the relatively long period of time that had elapsed from the alleged medical negligence to the discovery of the incident that ultimately led to Stephen's death should not be an impediment to recovery.

[14] Although the Diagnostic and Statistical Manual of Mental Disorders does not formally identify shock and neurosis as distinct mental disorders, it does recognize various dissociative and post-traumatic stress disorders commonly associated with shock; see American Psychiatric Association, supra, pp. 271–80, 291–307; as well as a range of anxiety and obsessive-compulsive disorders commonly associated with neurosis. Id., pp. 222–33, 235–64.

[15] See, e.g., *Lockett* v. *New Orleans*, 607 F.3d 992, 1003 (5th Cir.) (applying Louisiana law and stating that "the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable" [internal quotation marks omitted]), cert. denied, 562 U.S. 1003, 131 S. Ct. 507, 178 L. Ed. 2d 371 (2010); *Russ* v. *Causey*, 732 F. Supp. 2d 589, 606 (E.D.N.C. 2010) (applying North Carolina law and stating that plaintiff must proffer some evidence of " 'severe and disabling psychological problems' "), aff'd in part, 468 Fed. Appx. 267 (4th Cir. 2012); *Milberger* v. *KBHL, LLC*, 486 F. Supp. 2d 1156, 1165 (D. Haw. 2007) (applying Hawaii law, which imposes liability only "when it is reasonably foreseeable that a reasonable plaintiff-witness to an accident would not be able to cope with the mental stress engendered by such circumstances" [internal quotation marks omitted]); *Chizmar* v. *Mackie*, 896 P.2d 196, 204 (Alaska 1995) ("[s]erious mental distress may be found [when] a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances

of the case" [internal quotation marks omitted]); *Potter* v. *Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 989 n.12, 863 P.2d 795, 25 Cal. Rptr. 2d 550 (1993) (same); *Osborne* v. *Keeney*, 399 S.W.3d 1, 17 (Ky. 2012) (following Tennessee and concluding that liability may be imposed only for serious or severe emotional distress, which occurs when "a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case"); *Culbert* v. *Sampson's Supermarkets, Inc.*, supra, 444 A.2d 437 (concluding that bystander emotional distress claims are limited to those involving serious mental distress, "which can be found [when] a reasonable person normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event" [internal quotation marks omitted]); *Sacco* v. *High Country Independent Press, Inc.*, 271 Mont. 209, 234, 896 P.2d 411 (1995) ("Complete emotional [tranquility] is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only [when] the distress inflicted is so severe that no reasonable [person] could be expected to endure it." [Internal quotation marks omitted.]); *Parrish ex rel. Parrish* v. *Omaha Public Power District*, 242 Neb. 731, 732–33, 496 N.W.2d 914 (1993) ("[t]o be actionable, [the bystander's] emotional distress must have been so severe that no reasonable person could have been expected to endure it"), overruled in part on other grounds by *Gaytan* v. *Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014); *Folz* v. *State*, supra, 110 N.M. 471 (requiring "severe shock" beyond "grief or sorrow normally attending the death of a family member"); *Zivich* v. *Mentor Soccer Club, Inc.*, Ohio Court of Appeals, Docket No. 95-L-184 (Ohio App. April 18, 1997) ("Serious emotional distress describes emotional injury [that] is both severe and debilitating. Thus, serious emotional distress may be found [when] a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." [Internal quotation marks omitted.]), aff'd, 82 Ohio St. 3d 367, 696 N.E.2d 201 (1998); *Toney* v. *Chester County Hospital*, 614 Pa. 98, 107, 36 A.3d 83 (2011) (same); *Ramsey* v. *Beavers*, 931 S.W.2d 527, 532 (Tenn. 1996) (same); *Heldreth* v. *Marrs*, supra, 188 W. Va. 490 (injuries must be " 'both severe and debilitating' ").

[16] See, e.g., *Geraci* v. *Women's Alliance, Inc.*, 436 F. Supp. 2d 1022, 1033–34 (D.N.D. 2006) (applying North Dakota law); *Armstrong* v. *A.I. DuPont Hospital for Children*, 60 A.3d 414, 426 (Del. Super. 2012); *Elliott* v. *Elliott*, 58 So. 3d 878, 880 (Fla. App. 2011); *Carrillo* v. *Boise Tire Co.*, 152 Idaho 741, 750, 274 P.3d 1256 (2012); *Barnhill* v. *Davis*, 300 N.W.2d 104, 107–108 (Iowa 1981); *Ware ex rel. Ware* v. *ANW Special Educational Cooperative No. 603*, 39 Kan. App. 2d 397, 401, 180 P.3d 610 (2008); *Taylor* v. *Kurapati*, 236 Mich. App. 315, 360, 600 N.W.2d 670 (1999); *St. Onge* v. *MacDonald*, 154 N.H. 768, 770, 917 A.2d 233 (2007); *Hammond* v. *Central Lane Communications Center*, 312 Or. 17, 25, 816 P.2d 593 (1991); *Perrotti* v. *Gonicberg*, 877 A.2d 631, 637 (R.I. 2005); *Doe* v. *Greenville County School District*, 375 S.C. 63, 67–68, 651 S.E.2d 305 (2007); *Maryott* v. *First National Bank of Eden*, 624 N.W.2d 96, 104 (S.D. 2001); *Delk* v. *Columbia/HCA Healthcare Corp.*, 259 Va. 125, 138, 523 S.E.2d 826 (2000); see also *Vance* v. *Vance*, 286 Md. 490, 500–501, 408 A.2d 728 (1979) (manifestation of physical injury may be established through various forms of evidence); *Rodriguez* v. *Cambridge Housing Authority*, 443 Mass. 697, 701–702, 823 N.E.2d 1249 (2005) (requiring objective evidence of mental distress such as tension headaches); *Colbert* v. *Moomba Sports, Inc.*, 163 Wn. 2d 43, 50, 176 P.3d 497 (2008) (bystander "must demonstrate objective symptoms of emotional injury").

[17] See, e.g., *Groves* v. *Taylor*, 729 N.E.2d 569, 573 (Ind. 2000); *Crippens* v. *Sav on Drug Stores*, 114 Nev. 760, 762–63, 961 P.2d 761 (1998); *Gupta* v. *Asha Enterprises, L.L.C.*, 422 N.J. Super. 136, 151–52, 27 A.3d 953 (App. Div. 2011); *United Services Automobile Assn.* v. *Keith*, 970 S.W.2d 540, 542 (Tex. 1998); *Bowen* v. *Lumbermens Mutual Casualty Co.*, supra, 183 Wis. 2d 657; *Gates* v. *Richardson*, 719 P.2d 193, 199–200 (Wyo. 1986).

[18] In *Thing*, the court adopted the following rule for bystander emotional distress claims: "[A] plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, [the] plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (Footnotes omitted.) *Thing* v. *La Chusa*, supra, 48 Cal. 3d 667–68.

[19] We exercise plenary review over the trial court's decision to grant the defendants' motion for summary judgment. See, e.g., *Romprey* v. *Safeco Ins. Co. of America*, 310 Conn. 304, 313, 77 A.3d 726 (2013).

[20] Agnes Squeo was a fitness instructor at this time.